DA 12-0364

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2013 MT 82

IN THE MATTER OF:

K.E.G.,

A Youth Under the Age of 18.

APPEAL FROM:  District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DJ 12-008
Honorable Ingrid G. Gustafson, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Julie Brown; Montana Legal Justice, PLLC; Missoula, Montana

For Appellee:

Timothy C. Fox, Montana Attorney General; Pamela P. Collins, Assistant
Attorney General; Helena, Montana

Scott Twito, Yellowstone County Attorney; Christopher Morris, Deputy
County Attorney; Billings, Montana

Submitted on Briefs:  January 16, 2013

Decided:  April 2, 2013

Filed:

_____
Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1     K.E.G. appeals a commitment order from the Montana Thirteenth Judicial District Youth Court, Yellowstone County, which ordered him to pay $78,702.09 in restitution. We reverse in part and remand with directions to the Youth Court to hold a new restitution hearing.

¶2     We restate the issue on appeal as follows: *Did the Youth Court commit plain error when it concluded that K.E.G. was jointly and severally liable for the full amount of restitution for damages caused by the youths, without considering K.E.G.'s ability to pay that restitution?*

## PROCEDURAL AND FACTUAL BACKGROUND

¶3     Between December 22, 2011, and January 1, 2012, the Billings Police Department responded to over 200 reports of vandalism. During this eleven-day period, vandals shot the windows out of homes and vehicles with air guns, damaged vehicles with baseball bats, and set two cars on fire. An investigation led by local school resource officers indicated that K.E.G., a fifteen-year-old male, had taken part in the vandalism.

¶4     On January 10, 2012, K.E.G. and his mother met with Officer Jerry Smidt of the Billings Police Department. K.E.G. waived his rights and provided a statement to Officer Smidt. He admitted to committing acts of vandalism on December 26 and December 27, but stated he did not participate on any other date. According to an affidavit submitted by the Yellowstone County Attorney, K.E.G. admitted that he had "hit two windows with the gun" and "four or five windows with the bat" on the first night and that he had "hit five windows with the BB gun and three with the bat" on the second night.

2

¶5 Approximately two weeks later, the county attorney filed a petition alleging that K.E.G. was a delinquent youth for having committed criminal mischief (common scheme), a felony, in violation of §§ 45-6-101 and 45-2-101(8), MCA. Other youths involved in the vandalism similarly were charged. K.E.G. denied the State's allegations at his initial appearance on February 9, 2012. During a change of plea hearing in late March, K.E.G. admitted to having committed criminal mischief, common scheme, as alleged in the State's petition. The youth then detailed the acts of vandalism he committed on December 26 and December 27. The Youth Court accepted K.E.G.'s admission and change of plea.

¶6 Because K.E.G. contested the State's attempt to hold him jointly and severally liable for all damages caused during the eleven-day period of vandalism, the parties briefed the issue of restitution prior to the court's dispositional hearing. K.E.G. argued that, since he had admitted to participating in only two of the eleven nights of vandalism, "his restitution should be jointly and severally liable for only December 26th and 27th" in the amount of $16,020.63. The State countered by asserting that the Youth Court should "impose restitution in the amount of $78,702.09" pursuant to §§ 45-6-101(4) and 45-2-101(8), MCA.

¶7 The Youth Court held a hearing on restitution and disposition on April 23, 2012. K.E.G. and the county attorney presented arguments on the proper amount of restitution. At the hearing, the Youth Court made the following comments:

> With regard to restitution, the problem of course is that while you may not have been present at every act of criminal mischief, ***you have admitted to being responsible as part and parcel of a common scheme***, and the

3

common scheme asserted in the petition was the entire common scheme, and all of the days of this criminal mischief that went on with the various participants.

And it seems to me that ***because of that admission***, you should in fact be joint[ly] and severally liable with any other defendants that are -- or youth that are found to be responsible for the damage caused in this matter. And I am going to order that you be responsible for that restitution in the amount of $78,702.09. Now, I understand that in five years as a youth, ***it will be nearly impossible***, unless some -- something befalls upon you financially for you to pay that.

. . .

And my hope is that you will at least make some payments with restitution to make amends for the problems that you have caused basically unsuspecting people in our community.

(Emphasis added.) The Youth Court did not inquire into the extent of K.E.G.'s assets or his prospects for future earnings.

¶8 After the hearing, the court entered a dispositional order that adjudicated K.E.G. a delinquent youth for having committed criminal mischief (common scheme), a felony, and committed him to the Department of Corrections until his eighteenth birthday, with recommended placement at Pine Hills Youth Correctional Facility. The court also ordered K.E.G. to "pay restitution in the amount of $78,702.09 . . . joint and several in monthly payments of not less than $50.00 . . . or 50% of his net wages whichever is greater, with the first payment due within 30 days." The Youth Court retained jurisdiction over K.E.G. for restitution purposes until his twenty-first birthday, or until the restitution is paid in full. K.E.G. appeals from the portion of the dispositional order that ordered him to pay $78,702.09 in restitution.

4

## STANDARD OF REVIEW

¶9    The court's determination of the appropriate measure of restitution is a question of law, reviewed for correctness. *State v. Johnson*, 2011 MT 116, ¶ 13, 360 Mont. 443, 254 P.3d 578 (citing *State v. Pritchett*, 2000 MT 261, ¶ 18, 302 Mont. 1, 11 P.3d 539).

## DISCUSSION

¶10    *Did the Youth Court commit plain error when it concluded that K.E.G. was jointly and severally liable for the full amount of restitution for damages caused by the youths, without considering K.E.G.'s ability to pay that restitution?*

¶11    K.E.G. argues that he should be responsible to pay restitution for the amount of damage that was caused only on the nights during which he participated in the vandalism and that the joint and several liability for restitution imposed under the criminal mischief statute should not be applied to youthful offenders. The State argues that, pursuant to § 45-6-101(4), MCA, "the Youth Court was authorized by the Youth Court Act to aggregate the damages, and thus to order K.E.G. to pay restitution, jointly and severally, with the right of contribution, to all of the victims for all ten days of the common scheme." The State maintains that requiring full restitution imposes accountability and contributes to the youth's rehabilitation, arguing that it is not retributive simply because the youth will not be able to pay the full amount before the court loses jurisdiction over him. K.E.G. responds to this argument by pointing out that the Youth Court recognized it would be impossible for him to meet the restitution requirement, asserting that "[i]f Mont. Code Ann. § 45-6-101(4) is the basis for the amount of restitution owed by K.E.G., the case should be remanded for a full consideration of K.E.G.'s ability to pay"

5

$78,702.09 in restitution. K.E.G. claims that the Youth Court failed to fully consider K.E.G.'s ability to pay that amount as required by § 45-6-101(2), MCA.

¶12 The Montana Youth Court Act states that restitution is to be ordered by the youth court in "appropriate cases." Section 41-5-102(2)(c), MCA. When determining whether restitution is appropriate, the youth court may consider a number of factors, "in addition to any other evidence." Section 41-5-1521(1), MCA. Those factors include "the age of the youth, the ability of the youth to pay, the ability of the parents or guardians to pay, the amount of damage to the victim, and legal remedies of the victim." *In the Matter of T.M.R.*, 2006 MT 246, ¶ 14, 334 Mont. 64, 144 P.3d 809 (citing § 41-5-1521, MCA). Once the youth court determines that restitution is appropriate, it may order the youth to pay restitution. Sections 41-5-1513(1)(a), -1512(1)(d), MCA.

¶13 In this case, the Youth Court determined that restitution was appropriate and that K.E.G. should be held jointly and severally liable pursuant to § 45-6-101(4), MCA. Although the Dissent correctly notes that "K.E.G. has not been 'convicted' of" violating the statute, it errs in concluding that this statute therefore "is inapplicable." Dissent, ¶ 40. The Youth Court Act expressly authorizes the Youth Court to order a delinquent youth to pay restitution "for damages that result from the offense for which the youth is disposed . . . ." *In re T.M.R.*, ¶ 18 (quoting §§ 41-5-1512(1)(d), -1513(1)(a), MCA). The offense for which K.E.G. was disposed was § 45-6-101(4), MCA, which provides that "[a]mounts involved in criminal mischiefs committed pursuant to a common scheme or the same transaction, whether against the public or the same person or several persons, may be aggregated in determining pecuniary loss."

6

¶14 K.E.G. admitted to committing the offense of criminal mischief pursuant to a common scheme, which is "a series of acts or omissions motivated by a purpose to accomplish a single criminal objective or by a common purpose or plan that results in the repeated commission of the same offense . . . ." Section 45-2-101(8), MCA. Because K.E.G. acknowledged that he acted as part of a common criminal plan that resulted in 200 reports of vandalism against homes and vehicles in Billings between December 22, 2011, and January 1, 2012, the Youth Court was statutorily authorized to impose restitution for the aggregate damages that resulted from that common scheme during the time period charged.

¶15 *In re T.M.R.* does not counsel a different result. In that case, we noted that the *adult sentencing statutes* did not apply to a disposition under the Youth Court Act, and thus the Court was compelled to "fill in the gap left by the legislature" in determining the amount of restitution that should be imposed. *In re T.M.R.*, ¶¶ 16-18. In this case, the District Court did not apply adult sentencing statutes and there is no gap. Rather, aggregation of damages is allowed by the criminal statute defining "the offense for which the youth is disposed," for which the Youth Court Act expressly authorizes restitution. Sections 41-5-1512(1)(d), -1513(1)(a), MCA. Our conclusion is not altered by construing the Youth Court Act's restitution provision "in an 'equitable fashion'" in order to effectuate "'the intent of the legislature,'" *In re T.M.R.*, ¶ 18, since the expressed purposes of the Youth Court Act include restitution and accountability through "immediate" consequences of a youth's actions. Section 41-5-102(2)(a), (c), MCA. As vandalism sprees are not uncommonly the province of young, immature offenders, we

would do a disservice to the legislature's intent were we to exempt youth from this application of the criminal mischief statute when they admit to participating in a common scheme.

¶16 Nonetheless, while the aggregation of damage may well be appropriate to achieve the accountability goals of the Youth Court Act, both that Act and the applicable criminal law call for an examination of the offender's ability to pay. Sections 41-5-1521(1)(b), 45-6-101(2), MCA. The transcript of the dispositional and restitution hearing reflects almost no discussion of K.E.G.'s ability to pay, except the Youth Court's acknowledgment that it would be "nearly impossible" for him to meet the obligation, but that the court hoped he would "at least make some payments." Since the record also reflects that K.E.G. did not object to a restitution order without evidence of his ability to pay, we consider whether the issue is appropriate for review on appeal.

¶17 We generally "refuse to review on appeal an issue to which the party failed to object at the trial court." *State v. Kotwicki*, 2007 MT 17, ¶ 8, 335 Mont. 344, 151 P.3d 892 (citing *State v. Lenihan*, 184 Mont. 338, 341, 602 P.2d 997, 999 (1979)). While we have recognized an exception to this general rule for review of an illegal sentence, *Lenihan*, 184 Mont. at 343, 602 P.2d at 1000, we do not apply that exception here, since the failure to consider a defendant's ability to pay amounts only "to an objectionable sentence," which we have refused to consider absent a contemporaneous objection. *Kotwicki*, ¶ 13.

¶18 Despite the absence of contemporaneous objection, we will conduct "plain error" review if an alleged error "implicate[s] a defendant's fundamental constitutional rights

8

and if our failure to review the claimed error may result in a manifest miscarriage of justice, may leave unsettled the question of the fundamental fairness of the trial or proceedings, or may compromise the integrity of the judicial process." *In the Matter of C.T.P.*, 2004 MT 63, ¶ 15, 320 Mont. 279, 87 P.3d 399.

¶19 The Dissent correctly points out that we have reserved plain error review for questions implicating constitutional rights rather than statutory-based claims. Dissent, ¶ 30. The issue in this case, however, does have constitutional implications. Under Montana's Constitution, a person under eighteen has "all the fundamental rights of [an adult] unless specifically precluded by laws which enhance the protection of such persons." Mont. Const. art. II, § 15. We have recognized that a youth in the youth court system facing "a disposition different from an adult who has committed the same offenses" is "not similarly situated" to the adult with respect to Montana's sentencing laws. *In re S.M.K.-S.H*, 2012 MT 281, ¶ 28, 367 Mont. 176, 290 P.3d 718. The disposition in a youth court case should effectuate the Youth Court Act's purposes to prevent and reduce youth delinquency through a system that does not seek retribution but that provides consistent and enforceable consequences designed to accomplish a number of objectives, including rehabilitation of the youth, protection of the community, and restitution to victims. Section 41-5-102(2), MCA.

¶20 The criminal mischief statute expressly provides that, before a court may impose restitution, it must "determine the manner and amount of restitution *after full consideration of the convicted person's ability to pay the restitution*." Section 45-6-101(2), MCA (emphasis added). That subsection of the statute also requires that full

9

payment of restitution "must be made prior to the release of state jurisdiction" over the offender.

¶21 Other courts have recognized the importance of a realistic, defined restitution order for juvenile offenders to "permit the juvenile to feel that he or she is gainfully making amends for past transgressions." *In re Laurance S.*, 742 N.W.2d 484, 489 (Neb. 2007) (citing *State v. Kristopher G.*, 500 S.E.2d 519, 522 (W. Va. 1997) (stating that "[a]ny restitution award should . . . be set in an amount that is within the realistic ability of the children to pay within a reasonable period of time, so that they can complete a probationary period, put . . . events behind them, and move forward")). The "salutary purpose" an appropriate restitution order serves by "'making the offender understand that he has harmed not merely society in the abstract but also individual human beings, and that he has a responsibility to' the victim . . . , would be directly undermined by the imposition of a restitution order that the juvenile is financially unable to pay." *In re Laurance S.*, 742 N.W.2d at 489 (quoting *In re Brian S.*, 181 Cal. Rptr. 778, 780 (Cal. Ct. App. 1982)). Restitution may take on constitutional dimension in a youth case when the imposition fails to consider the enhanced protections embodied in the Youth Court Act's objectives of promoting the development of youth and providing a program of supervision and rehabilitation that avoids retribution and keeps youth from becoming adult offenders. Section 41-5-102, MCA.

¶22 Given the significant amount of restitution at issue in this case, the youth's commitment to Pine Hills, and the potential long-term consequences of the restitution order, K.E.G.'s future earning capacity and any assets available to immediately put

toward restitution were key considerations to determining whether his disposition would meet the objectives of the Youth Court Act and the requirements of § 45-6-101(2), MCA. Under these circumstances, we conclude that the Youth Court's failure to fully consider K.E.G.'s ability to pay prior to imposing aggregate restitution may leave unsettled the fundamental fairness to K.E.G. of the proceedings against him and therefore constituted plain error.

¶23    For the foregoing reasons, the Youth Court's April 25, 2012 order is reversed in part and remanded with directions to the Youth Court to hold a new restitution hearing pursuant to §§ 45-6-101(2) and 41-5-1521(1), MCA, to consider K.E.G.'s ability to pay the full amount of restitution.


                                        /S/ BETH BAKER

We concur:

/S/ MIKE McGRATH
/S/ PATRICIA COTTER
/S/ MICHAEL E WHEAT
/S/ JIM RICE



Justice Laurie McKinnon, concurring in part and dissenting in part.

¶24    I concur in the Court's decision to reverse the Youth Court's order and remand for the entry of a corrected restitution amount. I respectfully dissent, however, from the Court's analysis in reaching this conclusion. First, I believe the Court has improperly resolved this case based on a legal theory that K.E.G. neither raised in the Youth Court

11

nor relied on in his appeal before this Court. Second, I disagree with the Court's application of adult sentencing statutes to youth cases, where the Montana Youth Court Act has not expressly authorized the application of adult statutes. Finally, with respect to the legal theory that K.E.G. actually did raise in this appeal, it is my view that, under our caselaw and applicable statutes, K.E.G. cannot be required to pay restitution for damages which he did not admit he caused and which the State never proved he caused. I address these three points in turn.

## I. The Court's Sua Sponte "Plain Error" Review

¶25    "It is perhaps our most fundamental rule of appellate review that, with rare exception, we will not consider an issue or claim that was not properly preserved for appeal." *State v. Norman*, 2010 MT 253, ¶ 16, 358 Mont. 252, 244 P.3d 737. To properly preserve an issue for appeal, it is necessary that the issue be timely raised in the first instance in the trial court. *Norman*, ¶ 16. One oft-stated reason for this rule is that "it is fundamentally unfair to fault the trial court for failing to rule correctly on an issue it was never given the opportunity to consider." *State v. West*, 2008 MT 338, ¶ 16, 346 Mont. 244, 194 P.3d 683 (internal quotation marks omitted); *see also e.g. State v. Clary*, 2012 MT 26, ¶ 19, 364 Mont. 53, 270 P.3d 88 ("[W]e will not put a district court in error for failing to address an issue or an argument that was not made before it." (internal quotation marks omitted)); *State v. Evans*, 2012 MT 115, ¶ 26, 365 Mont. 163, 280 P.3d 871 ("While Evans faults the State and the District Court for the claimed errors listed above, neither was afforded an opportunity to correct or explain them because Evans made no contemporaneous objection."). "Above all else," however, "the rationale

underlying the timely-objection rule is judicial economy and bringing alleged errors to the attention of each court involved, so that actual error can be prevented or corrected at the first opportunity." *West*, ¶ 17 (internal quotation marks omitted).

¶26 One of the "rare" and "narrow" exceptions to the timely-objection rule is the doctrine of plain error review. *West*, ¶¶ 19-20; *Norman*, ¶ 16. This doctrine is founded on the principle that " 'appellate courts have the inherent duty to interpret the constitution and to protect individual rights set forth in the constitution and necessarily have the correlative authority to invoke the plain error doctrine in order to carry out those duties.' " *West*, ¶ 23 (brackets omitted) (quoting *State v. Finley*, 276 Mont. 126, 134, 915 P.2d 208, 213 (1996)). Given our "inherent power and paramount obligation to interpret Montana's Constitution and to protect the various rights set forth in that document," we may discretionarily review "claimed errors that implicate a criminal defendant's fundamental constitutional rights." *West*, ¶ 23 (internal quotation marks omitted). We use this doctrine "sparingly, on a case-by-case basis," and only where failing to review the claimed error "may result in a manifest miscarriage of justice, may leave unsettled the question of the fundamental fairness of the trial or proceedings, or may compromise the integrity of the judicial process." *West*, ¶ 23 (internal quotation marks omitted).

¶27 The Court today mistakenly applies the plain error doctrine in two ways. First, the "claimed error" the Court identifies is the Youth Court's failure to consider K.E.G.'s

ability to pay the aggregate restitution.[1] The Court cites the ability-to-pay requirement contained in § 45-6-101(2), MCA, and then reverses the Youth Court's restitution order because "the Youth Court's failure to fully consider K.E.G.'s ability to pay prior to imposing aggregate restitution . . . constituted plain error." Opinion, ¶¶ 20, 22. That, however, is not the claimed error K.E.G. raises on appeal—much less an error K.E.G. asks us to review under the plain error doctrine.

¶28 K.E.G. admitted in the Youth Court that he engaged in criminal mischief (common scheme) within the timeframe alleged in the County Attorney's Petition—i.e., "from about December 22, 2011, to January 1, 2012"—but not over this entire timeframe. K.E.G. admitted to breaking vehicle windows on December 26 and 27, 2011, but he denied engaging in such activity on any other night between December 22 and January 1. Accordingly, K.E.G. acknowledged that he is jointly and severally responsible to pay restitution in the amount of $16,020.63, which represents the combined damages that he and the other youths caused on December 26 and 27. K.E.G. maintained, however, that his restitution liability does not extend to the vandalism that other youths caused on other nights when K.E.G. was not present. His basis for this argument: the applicable statutes and this Court's caselaw require a causal connection between an offender's unlawful conduct and his restitution obligation, and there is no causal connection between K.E.G.'s unlawful conduct on December 26 and 27 and the damages that occurred on the other nights between December 22 and January 1. At no point did K.E.G. argue that the Youth

---

[1] I refer to the total amount of damages caused by all the youths over the ten-day period from December 22, 2011, to January 1, 2012, as the "aggregate" amount of restitution.

14

Court must consider his ability to pay the restitution amount. Even when the Youth Court imposed the aggregate restitution of $78,702.09, K.E.G. did not object that the court was first required to consider his ability to pay this amount. Correspondingly, on appeal, K.E.G.'s stated issue is:

> Whether the district court erred when it concluded that K.E.G. was joint and severally liable for the full amount of restitution for damage that occurred over the course of ten consecutive nights where K.E.G. admitted to committing acts of Criminal Mischief (Common Scheme) but only admitted to being present for two nights.

As he did in the Youth Court, K.E.G. argues on appeal that there must be a causal connection between his unlawful conduct and his restitution obligation. K.E.G. does not invoke plain error review of this issue, given that he preserved the issue in the Youth Court by raising it there.

¶29 In the vast majority of cases where the defendant-appellant has actually requested plain error review of an unpreserved claim, this Court routinely has denied that request, noting that we apply the doctrine sparingly. *See e.g. Evans*, ¶¶ 24-28; *State v. Lacey*, 2012 MT 52, ¶¶ 14, 21-26, 364 Mont. 291, 272 P.3d 1288; *State v. Daniels*, 2011 MT 278, ¶¶ 29-33, 362 Mont. 426, 265 P.3d 623; *State v. Wilson*, 2011 MT 277, ¶¶ 27-29, 362 Mont. 416, 264 P.3d 1146; *State v. Roundstone*, 2011 MT 227, ¶¶ 29-33, 362 Mont. 74, 261 P.3d 1009. In the present case, as explained, K.E.G. has not requested that we exercise plain error review. Nor has he raised "ability to pay" as an issue on appeal. Thus, the Court's choice to reach the ability-to-pay issue nonetheless, although it was not presented and argued by the parties, disregards our rules and is contrary to the policy of applying plain error review sparingly. The Court's approach also "ignores a fundamental

15

premise of our adversarial system: that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them." *Knox v. Serv. Employees Intl. Union*, ___ U.S. ___, 132 S. Ct. 2277, 2298 (2012) (Sotomayor & Ginsburg, JJ., concurring in the judgment) (citations and internal quotation marks omitted). "Our refusal to abide by standard rules of appellate practice is unfair to the [Youth Court], whose judgment the Court vacates, and especially to the [appellee] here, who suffers a loss in this Court without *ever* having an opportunity to address the merits of the statutory question the Court decides."[2] *Jefferson v. Upton*, ___ U.S. ___, 130 S. Ct. 2217, 2227 (2010) (Scalia & Thomas, JJ., dissenting) (emphasis in original).

¶30 There is a second reason the Court's application of plain error review in this case is mistaken. That doctrine applies to the review of alleged errors that implicate a defendant's fundamental *constitutional* rights. *State v. Taylor*, 2010 MT 94, ¶ 13, 356 Mont. 167, 231 P.3d 79; *accord* Opinion, ¶ 18. We do not apply the doctrine to statutory-based claims because the Legislature has enacted two statutes (specifically,

---

[2] K.E.G. does discuss "ability to pay" is in his reply brief on appeal, which is the source of the language quoted by the Court at ¶ 11 of the Opinion. But there are three things that should be noted about K.E.G.'s discussion. First, because he addresses this matter for the first time in his reply brief, the State has not had the opportunity to respond. Second, we have held many times that we will not address the merits of an issue presented for the first time in a reply brief. *State v. Makarchuk*, 2009 MT 82, ¶ 19, 349 Mont. 507, 204 P.3d 1213; *Pengra v. State*, 2000 MT 291, ¶ 13, 302 Mont. 276, 14 P.3d 499. Third, the ability-to-pay requirement that K.E.G. discusses in his reply brief is contained in § 45-6-101(2), MCA. Yet, prior to discussing this requirement, K.E.G. argues that the sentencing-related subsections of § 45-6-101, MCA, do not apply to him. He merely concludes this argument with the observation that if § 45-6-101, MCA, is the basis for imposing a restitution obligation on him—a point K.E.G. does not concede— then the statute's ability-to-pay requirement ought to be imposed as well.

16

§§ 46-20-104(2) and -701, MCA) that "uniquely restrict[ ] review of errors not objected to at trial," and "it would be incongruous for this Court to review [a] statutory-based claim notwithstanding the statutory-based prohibition on our doing so." *West*, ¶ 22 (first brackets in original, internal quotation marks omitted).

¶31 Here, K.E.G. has not alleged in the Youth Court or in this Court that the Youth Court's imposition of restitution, without first considering his ability to pay, rises to a constitutional violation. He cites neither the United States Constitution nor the Montana Constitution anywhere in his briefs. Nevertheless, the Court decides, sua sponte, that the imposition of a restitution obligation without consideration of the offender's ability to pay has "constitutional implications" and "constitutional dimension"—at least "in a youth case." Opinion, ¶¶ 19, 21. In essence, without briefing or argument on the point, the Court announces a constitutional right of youths to receive consideration of their ability to pay—whether they ask for it or not—before the youth court may impose a restitution obligation. Opinion, ¶¶ 19, 21. Notably, this new right appears to be in tension with the Youth Court Act, which states that "the ability of the youth to pay" is a factor that "may" (not "must" or "shall") be considered in determining whether restitution is appropriate. Section 41-5-1521(1)(b), MCA. In any event, I do not believe that sua sponte application of our plain error doctrine is a proper vehicle for deciding a constitutional question that (1) the appellant has not raised and (2) requires us to announce a new constitutional right.

¶32 For the foregoing reasons, I dissent from our decision to "restate" the issue on appeal so that we may sua sponte exercise plain error review. Opinion, ¶ 2. The Court's

17

"restated" issue was not raised in the Youth Court or in K.E.G.'s opening brief on appeal, and the Court's ensuing analysis misapplies our plain error doctrine.

## II. The Court's Application of Adult Sentencing Statutes to a Youth

¶33 Three statutes within the Youth Court Act authorize the youth court to impose a restitution obligation upon a youth: § 41-5-1304(1), MCA (where a consent adjustment has been reached without the filing of a petition), § 41-5-1512(1), MCA (following an adjudicatory finding that the youth is in need of intervention or has violated a consent adjustment), and § 41-5-1513(1), MCA (following an adjudicatory finding that the youth is delinquent, as is the case here). Section 41-5-1521(1), MCA, in turn, specifically provides for the manner in which such restitution is to be determined. It directs the youth court as follows:

> In determining whether restitution . . . is appropriate in a particular case, the following factors *may* be considered in addition to any other evidence:
> (a) the age of the youth;
> (b) the ability of the youth to pay;
> (c) the ability of the parents, guardian, or those that contributed to the youth's delinquency or need for intervention to pay;
> (d) the amount of damage to the victim; and
> (e) legal remedies of the victim. However, the ability of the victim or the victim's insurer to stand any loss may not be considered.

Section 41-5-1521(1), MCA (emphasis added). Therefore, based on this provision, the youth's ability to pay, as well as that of the youth's parents, is one of several factors that the youth court "may" consider in determining whether restitution is appropriate.

¶34 Any restitution obligation in youth court proceedings imposed pursuant to in the adult criminal statutes and sentencing provisions of Titles 45 and 46 of the Montana Code

18

Annotated directly conflicts with these specific provisions of the Youth Court Act. Indeed, we have previously refused to apply adult sentencing statutes to a restitution obligation imposed on a delinquent youth under the Youth Court Act. Our decision in *In re T.M.R.*, 2006 MT 246, 334 Mont. 64, 144 P.3d 809, involved a youth (T.M.R.) who had been adjudicated delinquent. He was placed on probation and ordered to pay restitution pursuant to § 41-5-1513(1), MCA. His case was then transferred to district court for supervisory responsibility pursuant to § 41-5-208, MCA. *T.M.R.*, ¶ 14. The issue on appeal concerned the amount of restitution T.M.R. owed. The State advocated for the definition of "pecuniary loss" found in § 46-18-243, MCA, but we agreed with T.M.R. that it was not appropriate to apply this adult sentencing statute. *T.M.R.*, ¶ 16. We noted that, pursuant to § 41-5-208(4), MCA, if a youth violates a disposition imposed under § 41-5-1512 or -1513, MCA, then the district court may impose the adult restitution statutes, including § 46-18-243, MCA. *T.M.R.*, ¶ 16. However, because there was no evidence that T.M.R. had violated his disposition conditions, we held that he was not subject to sentencing under the adult statutes. *T.M.R.*, ¶ 17. Implicit in our analysis was the principle that the adult restitution statutes do not apply to youths unless there is express authority for such application in the Youth Court Act.

¶35 The Court's attempts at distinguishing *T.M.R.* from the present case fall short. First, the Court states that the Youth Court did not apply adult sentencing statutes to K.E.G.'s disposition. Opinion, ¶ 15. But that is exactly what the Youth Court did. The purported authority for the Youth Court to impose an aggregated restitution obligation on K.E.G. is § 45-6-101, MCA. The first subsection of this statute sets forth the elements of

19

the offense. For purposes here, "[a] person commits the offense of criminal mischief if the person knowingly or purposely injures, damages, or destroys any property of another or public property without consent." Section 45-6-101(1)(a), MCA. The remainder of the statute is dedicated to punishment and sentencing considerations:

• Subsection (2) provides that a person who has been "convicted" of criminal mischief must be ordered to make restitution in an amount and manner to be set by the court. As the Court concedes, and as I discuss below, K.E.G. has not been "convicted" of criminal mischief. Opinion, ¶ 13; § 41-5-106, MCA.

• Subsection (3) provides that a person who has been "convicted" of criminal mischief shall be fined not to exceed $1,500, imprisoned in the county jail for any term not to exceed six months, or both; but if the offender causes "pecuniary loss" in excess of $1,500, then the offender shall be fined an amount not to exceed $50,000, imprisoned in the state prison for a term not to exceed ten years, or both.

• Subsection (4) provides that, in determining "pecuniary loss," amounts involved in criminal mischiefs committed pursuant to a common scheme or the same transaction may be aggregated.

• Lastly, subsection (5) provides that a person "convicted" of criminal mischief involving property owned or administered by the Department of Fish, Wildlife, and Parks shall forfeit any current hunting, fishing, or trapping license issued by the State and the privilege to hunt, fish, or trap in the State for at least 24 months.

It is clear, then, that by applying subsection (4) of § 45-6-101, MCA, the Youth Court (and now this Court) applied an adult sentencing statute. As *T.M.R.* holds, adult statutes are not applicable to youths unless the Youth Court Act expressly provides otherwise.

¶36 The Court's second attempted distinction between the present case and *T.M.R.* is that the Youth Court Act authorizes restitution for damages that result from the offense for which the youth is disposed, and "[t]he offense for which K.E.G. was disposed was § 45-6-101(4), MCA." Opinion, ¶¶ 13, 15. As explained above, however, subsection (4) does not set forth the "offense" of criminal mischief. That offense is set forth in

20

subsection (1) of the statute, which states: "A person commits the offense of criminal mischief if the person knowingly or purposely . . . ." Subsection (4), in turn, merely sets forth a sentencing consideration—namely, that in determining whether the offender is subject to an enhanced punishment of $50,000 and ten years in state prison, amounts involved in criminal mischiefs committed pursuant to a common scheme or the same transaction may be aggregated in determining pecuniary loss.[3] Aggregation of pecuniary loss under subsection (4), in other words, simply determines an adult offender's sentence exposure for the offense.

¶37 We have recognized that there is more than an "artificial distinction" between a disposition imposed under the Youth Court Act and a sentence imposed under the Montana Criminal Code. *See In re B.L.T.*, 258 Mont. 468, 473, 853 P.2d 1226, 1229 (1993). The special treatment afforded youths under the Act is reflected in the express legislative purposes set forth in § 41-5-102, MCA, and in the myriad statutes (noted below) that distinguish youth proceedings from adult criminal proceedings. The Court's approach today in finding that an adult criminal sentencing statute gave the Youth Court authority to impose a restitution obligation on a youth, Opinion, ¶¶ 13-14, undermines the legislative intent to treat youths differently than adult offenders.

---

[3] "Common scheme" is defined elsewhere in the Code as "a series of acts or omissions motivated by a purpose to accomplish a single criminal objective or by a common purpose or plan that results in the repeated commission of the same offense or that affects the same person or the same persons or the property of the same person or persons." Section 45-2-101(8), MCA.

¶38 The Youth Court Act exists to address youth delinquency through a mechanism distinct and apart from the adult criminal justice system. *See* §§ 41-5-102, -106, MCA. The legislative purposes of the Act, as stated in § 41-5-102, MCA, are:

1. to preserve the unity and welfare of the family whenever possible, and to provide for the care, protection, and wholesome mental and physical development of the youth;

2. to prevent and reduce youth delinquency through a system that does not seek retribution, but that provides: consequences for the youth's actions; a program of supervision, care, rehabilitation, detention, competency development, and community protection for the youth before he becomes an adult offender; restitution in appropriate cases; and, if removal from the home is necessary, the ability of the youth to maintain ethnic, cultural, or religious heritage whenever appropriate;

3. to achieve these purposes in a family environment if possible, separating the youth from the parents only when necessary for the welfare of the youth or for the safety and protection of the community; and

4. to provide judicial procedures in which the parties are ensured a fair, accurate hearing and recognition and enforcement of their constitutional and statutory rights.

The youth courts were established to fulfill these purposes. Section 41-5-201, MCA.

¶39 That the Legislature intended youths to be treated differently than adult offenders is apparent from various facets of the Youth Court Act. For example, no youth may be charged with or convicted of any crime in any court except as provided in the Act. Section 41-5-106, MCA; *see also* § 41-5-206(4), MCA. With limited exceptions, the youth court has exclusive original jurisdiction of all proceedings in which a youth is alleged to be delinquent. Section 41-5-203(1), MCA. A "delinquent youth" is a youth who has committed "an offense that, if committed by an adult, would constitute a criminal offense." Section 41-5-103(11)(a), MCA. Most importantly, a finding that a

22

youth is delinquent is not a criminal conviction: "No adjudication upon the status of any youth in the jurisdiction of the court shall operate to impose any of the civil disability imposed on a person by reason of conviction of a criminal offense, nor shall such adjudication be deemed a criminal conviction." Section 41-5-106, MCA. Also, "[n]o placement of any youth in any state youth correctional facility under [the Youth Court Act] shall be deemed commitment to a penal institution."[4] Section 41-5-106, MCA.

¶40 As discussed, the statute this Court cites as authority for K.E.G.'s restitution obligation provides, in pertinent part: "A person convicted of criminal mischief must be ordered to make restitution in an amount and manner to be set by the court. The court

[4] In addition to the foregoing statutes, the following statutory provisions reflect the unique treatment of youth versus adult offenders: § 41-5-206(6), MCA (allowing a youth to be sentenced under Titles 45 and 46 if the youth has been convicted in district court of one of the enumerated offenses, but otherwise requiring the youth to be sentenced under Title 41); § 41-5-208(2), (3), MCA (listing prerequisites for the transfer of certain youth cases to district court); §§ 41-5-216, -1524(2), MCA (requiring youth court records to be "physically sealed" on the youth's 18th birthday, with certain exceptions); § 41-5-321(2), MCA (clarifying that the taking of a youth into custody is not an "arrest"); §§ 41-5-334(1), -349(1), -1522(2), MCA (providing, with limited exceptions, that a youth may not be detained or placed in a facility used for the confinement of adults accused or convicted of criminal offenses); §§ 41-5-1301, -1302, MCA (permitting youth matters to be resolved through informal dispositions and consent adjustments, in lieu of formal proceedings); §§ 41-5-1401, -1402, MCA (specifying procedures for commencing a formal proceeding against a youth); § 41-5-1431(3), MCA (stating that the standard of proof in probation revocation of a youth is the same standard used in probation revocation of an adult, but that, "[i]n all other respects," the proceedings "are governed by the procedures, rights, and duties applicable to proceedings on petitions alleging that the youth is delinquent or a youth in need of intervention"); § 41-5-1501, MCA (permitting a consent decree in lieu of an adjudication); § 41-5-1502, MCA (specifying procedures at an adjudicatory hearing); § 41-5-1524(3), MCA (requiring youth records to be maintained in a separate management information system and not to be included in an adult offender management system, unless the youth has been adjudicated as an adult); § 41-5-1604(1)(a), MCA (distinguishing between "juvenile dispositions under 41-5-1512 or 41-5-1513" and "any sentence allowed by the statute that establishes the penalty for the offense . . . and that would be permissible if the offender were an adult").

shall determine the manner and amount of restitution after full consideration of the convicted person's ability to pay the restitution." Section 45-6-101(2), MCA. The statute further provides: "Amounts involved in criminal mischiefs committed pursuant to a common scheme or the same transaction . . . may be aggregated in determining pecuniary loss." Section 45-6-101(4), MCA. Nevertheless, there can be no dispute, based on the aforementioned provisions of the Youth Court Act, that K.E.G. has not been "convicted" of criminal mischief. Section 41-5-106, MCA. Therefore, § 45-6-101, MCA, by its terms, is inapplicable. The State's incorporation of a particular criminal statute into a petition alleging that a youth is delinquent is for the purpose of bringing the youth to court and providing the youth with notice of the allegations which, "if [the youth were] an adult, would constitute a criminal offense." Section 41-5-103(11)(a), MCA. Incorporation of the criminal statute into a youth court petition for purposes of charging does not thereby remove the proceedings from the operation of the Youth Court Act and subject the youth to sentencing as if the youth were a convicted adult offender.

¶41 The dispositions that the youth court may impose on a delinquent youth are set forth in § 41-5-1513, MCA. A couple of these dispositions involve the application of Title 46. *See* §§ 41-5-1512(1)(k), -1513(1)(a), MCA (authorizing the youth court to place a delinquent youth under home arrest as provided in Title 46, chapter 18, part 10, MCA); § 41-5-1513(1)(c), (1)(d), (2), MCA (authorizing the youth court to require a delinquent youth adjudicated for a violent or sexual offense to register as a violent or sexual offender pursuant to Title 46, chapter 23, part 5, MCA). However, aside from these two specific grants of authority to apply particular provisions of Title 46, there is no general grant of

24

authority to the youth court to apply the sentencing provisions of Titles 45 and 46 to a youth adjudicated as delinquent. Rather, the Legislature intended such youths to be subject to the dispositions enumerated in the Youth Court Act itself.

¶42 For all of these reasons, I disagree with the Court's contention that it is not applying adult sentencing provisions to K.E.G., and I respectfully dissent from the Court's decision to apply those provisions to the disposition of a youth adjudicated as delinquent under the Youth Court Act. I instead would apply the provisions set forth in the Youth Court Act itself.

### III. The Court's Failure to Apply the Causal Requirement

¶43 This brings me to the issue argued by K.E.G. on this appeal: that there is no causal connection between his unlawful conduct and his restitution obligation for the aggregate damages.

¶44 Within the context of criminal offenses, we have consistently stated that "a causal relation between the offender's criminal conduct and the pecuniary loss is the touchstone for determining whether a person or entity is a victim entitled to restitution. We will not hold an offender accountable for restitution for offenses he or she did not commit." *City of Billings v. Edward*, 2012 MT 186, ¶ 26, 366 Mont. 107, 285 P.3d 523 (citations and internal quotation marks omitted); *accord State v. Brownback*, 2010 MT 96, ¶ 20, 356 Mont. 190, 232 P.3d 385; *State v. Breeding*, 2008 MT 162, ¶ 13, 343 Mont. 323, 184 P.3d 313; *State v. Beavers*, 2000 MT 145, ¶¶ 9-11, 300 Mont. 49, 3 P.3d 614. As the statutes referenced in these cases require restitution for damages that "arise out of" or are "a result of" the offender's unlawful conduct (*see* §§ 46-18-201(5), -241(1), -243(1),

-243(2)(a), MCA), we have held that an offender may not be ordered to pay restitution in excess of the damages caused by that conduct. *Beavers*, ¶ 12; *Breeding*, ¶¶ 13-19. We also have recognized that some pecuniary losses may be so attenuated as to no longer be considered "a result of" the offense. *Brownback*, ¶ 20 n. 1.

¶45 Given this precedent, the Court's reliance on the criminal mischief statute for the proposition that " 'amounts involved in criminal mischiefs committed pursuant to a common scheme . . . may be aggregated in determining pecuniary loss' " is unpersuasive. Opinion, ¶ 13 (quoting § 45-6-101(4), MCA). Assuming for the moment, and purely for the sake of argument, that this adult sentencing statute is applicable to a youth such as K.E.G., the question then becomes: What does "pecuniary loss" mean? That term is defined, for restitution purposes, as the full replacement cost of property taken, destroyed, harmed, or otherwise devalued "as a result of" the offender's criminal conduct. Section 46-18-243(1)(b), MCA. Accordingly, while amounts involved in criminal mischiefs committed pursuant to a common scheme may be aggregated, the "pecuniary loss" forming the basis of any restitution award must have been "a result of" the offender's criminal conduct. Section 45-6-101(4), MCA, does not vitiate this causal requirement. The Court's reasoning that "vandalism sprees are not uncommonly the province of young, immature offenders," Opinion, ¶ 15, does not excuse the Court's failure to limit K.E.G.'s restitution obligation—as he argues on appeal—to those damages that he actually caused.

¶46 Unlike the adult sentencing statutes cited above, the youth disposition statutes do not mandate restitution in all cases. Rather, a restitution obligation "may" be imposed on

26

a youth in an "appropriate" case. *See* §§ 41-5-102(2)(c), -1304(1)(d), -1512(1)(d), -1513(1)(a), -1521(1), MCA. Even in the "appropriate" case, however, the youth statutes—like the adult statutes—mandate that restitution be "for damages that result from the offense for which the youth is disposed." Sections 41-5-1512(1)(d), -1513(1)(a), MCA. Like the adult statutes, the youth statutes define "victim" as a person who has suffered property, physical, or emotional injury "as a result of" the youth's unlawful conduct. Section 41-5-103(44)(a), MCA. This "result from" and "as a result of" language creates the same causal requirement that we held exists in the adult statutes. *See Edward*, ¶¶ 25-26; *Brownback*, ¶ 20; *Breeding*, ¶¶ 12-13; *Beavers*, ¶¶ 8, 12. Hence, it follows that a youth may not be ordered to pay restitution in excess of the damages caused by the youth's unlawful activities. I note, further, that in the context of a youth court proceeding, it is particularly important that the youth understand he or she is being held responsible only for the damage resulting from the delinquent act. As set forth in the Youth Court Act, its purpose is to provide "judicial procedures in which the parties are ensured a fair, accurate hearing . . . ." Section 41-5-102(4), MCA.

¶47 The dispositive question in this appeal, then, is what damages occurred "as a result of" K.E.G.'s unlawful conduct. In the Petition filed with the Youth Court, the County Attorney alleged that:

> from about December 22, 2011, to January 1, 2012, the Youth, [K.E.G.], knowingly or purposely injured, damaged, or destroyed property of another or public property without consent, and did so in a series of acts motivated by a purpose or plan which resulted in the repeated commission of the same offense or that affected the same person or persons or their property . . . [in] violation of Sections 45-6-101 and 45-2-101(8), Montana Code Annotated.

Four youths were identified in the Petition as participating with K.E.G. to damage vehicles. But the State did not allege a conspiracy among the youths, § 45-4-102, MCA, or allege that K.E.G. was legally accountable for the other youths' conduct, § 45-2-301, MCA. Either allegation might arguably have expanded K.E.G.'s culpability beyond the two-day timeframe for which he admitted delinquent conduct, if he had tendered an admission to conspiracy or accountability. K.E.G. was alleged, however, to have embarked on a common scheme to injure, damage, or destroy property from "about" December 22 to January 1. His admissions to only two nights of delinquent conduct still constituted a common scheme.

¶48 At his initial appearance, K.E.G. denied the County Attorney's allegations in the Petition. At a subsequent hearing, however, K.E.G. admitted that he did engage in criminal mischief (common scheme) within the alleged timeframe, though not over the entire timeframe. The Court's assertion that K.E.G. "acknowledged that he acted as part of a common criminal plan that resulted in 200 reports of vandalism against homes and vehicles in Billings between December 22, 2011, and January 1, 2012," Opinion, ¶ 14, is factually incorrect. K.E.G. never admitted to acting as part of such a "plan"—which is essentially a mischaracterization of the charge here as one of "conspiracy." While admitting that he had damaged or destroyed property on December 26 and 27, K.E.G. continued to deny engaging in such activity on any other night between December 22 and January 1.

¶49 This is reflected in the following colloquy among K.E.G., his counsel (Mr. Duke), and the Youth Court:

28

MR. DUKE: He is going to admit to the petition that he was involved with two days on the criminal mischief . . . .

THE COURT: All right. So -- well, [K.E.G.], based on what your counsel has related to me, I need to make sure that you understand what your rights are. [The court proceeded to advise K.E.G. of his rights.]

.   .   .

THE COURT: Okay. If you make admissions today, there isn't going to be a trial, and you are, in essence, waiving your right to a trial. You understand that?

THE YOUTH: Yes.

THE COURT: And the State isn't going to have to prove anything. You understand that?

THE YOUTH: (Nods.) For the -- for the two other days that I wasn't involved or what?

THE COURT: For -- well, for what you were admitting to. Okay?

MR. DUKE: Right, if you admit, they don't have to prove those two days.

THE YOUTH: Okay.

MR. DUKE: Do you understand that?

THE YOUTH: Yes.

¶50    K.E.G.'s admission to only two days is also reflected in the factual basis he provided for the admission:

THE COURT: Okay. In the petition, you are alleged to be a delinquent youth by virtue of committing the offense of criminal mischief, common scheme, a felony, alleged to have occurred on or about December 22nd, 2011, to January 1st, 2012. With regard to that offense, how do you plead?

THE YOUTH: Guilty.

THE COURT: Do you admit or deny it?

THE YOUTH: I admit.

THE COURT: Okay. And, Mr. Duke, are you going to -- would you like to assist your client in having him tell me what it is he did?

MR. DUKE: Yes, just a few questions, Your Honor.

EXAMINATION

BY MR. DUKE:

29

> Q. [K.E.G.], on December 26th and December 27th, were you here in Billings, Yellowstone County?
>
> A. Yes.
>
> Q. And you were riding around in a vehicle with other youths, whose initials are J.E., L.P., K.G.?
>
> A. Mm-hmm.
>
> Q. And perhaps T.B.?
>
> A. Yes.
>
> Q. And on those two nights you participated by breaking various windows from vehicles?
>
> A. Yes.
>
> Q. And what did you use to break the windows?
>
> A. A bat and a couple of them with a co2 bb gun.
>
> Q. And you believe that the amount of loss on those two days exceeds $1,500?
>
> A. Yes.
>
> Q. And if you would estimate, how many vehicles that were damaged during those two?
>
> A. Myself or altogether?
>
> Q. Well, with the group that was -- you are with that night? Of those two days, excuse me.
>
> A. Both nights put together, I would say around 30 cars, 30 windows.
>
> MR. DUKE: I have no further questions, Your Honor.
>
> THE COURT: Well, [K.E.G.], based on that description, it does appear to me that you in fact did commit these -- this offense and I'm going to accept your admission.

¶51 In imposing the aggregate restitution amount, the Youth Court stated that "while you may not have been present at every act of criminal mischief, you have admitted to being responsible as part and parcel of a common scheme, and the common scheme asserted in the petition was the entire common scheme, and all of the days of this criminal mischief that went on with the various participants." K.E.G. pointed out that he had not admitted to "the entire common scheme" alleged in the Petition. In response, the court stated: "I am not functioning under the belief that [K.E.G.] was present at every act

30

of criminal mischief alleged in the restitution matters. I believe that he was there two days, as he has said. I do believe that he, however, did admit to that common scheme."

¶52 Based upon this record, I believe the Youth Court's and this Court's determination that K.E.G. admitted to (as the Court puts it) "a common criminal plan that resulted in 200 reports of vandalism against homes and vehicles in Billings between December 22, 2011, and January 1, 2012," is not correct. While the State alleged that K.E.G.'s common scheme occurred "from about December 22, 2011, to January 1, 2012," the transcript of the proceeding clearly establishes that K.E.G. never admitted to a common scheme spanning those dates. K.E.G. and his counsel were very clear—both before making his admission and during the recitation of the factual basis for the admission— that his offense took place on December 26 and 27, and only those two nights. K.E.G. maintained his denial as to the other eight nights and brought alibi witnesses to the disposition hearing to establish that he was not present on those other nights.

¶53 Significantly, the State chose to accept K.E.G.'s admission to only a portion of the delinquent acts alleged in the Petition. The State chose not to proceed with an adjudicatory hearing in which the State might prove K.E.G.'s involvement in more than just two nights. Despite this decision, however, the State has sought to hold K.E.G. accountable for conduct that K.E.G. denied and that the State chose not to prove. Neither the State nor the Youth Court nor this Court has identified any legal authority supporting this acceptance of an admission where a factual basis for the other eight nights has not been established and, in fact, has been specifically denied by K.E.G. It has never been established factually that K.E.G.'s common scheme extended to any other night(s)

31

between December 22 and January 1, or that the damages which occurred on the other nights "resulted from" K.E.G.'s unlawful conduct on December 26 and 27.

¶54 In its Sentencing Memorandum Regarding Restitution (filed in the Youth Court on April 23, 2012), the State argued that K.E.G. had "encourag[ed]" the other youths to commit the vandalism on all ten nights and that K.E.G. thus bore responsibility for the other youths' actions on nights when K.E.G. was not present—i.e., as the State put it, "In for a penny, in for a pound." The fact remains, however, that the State did not charge K.E.G. under an accountability theory. *See* §§ 45-2-301, -302, MCA. K.E.G. was charged with criminal mischief over a ten-night period, he admitted to a two-night common scheme, and the State chose not to prove the other eight nights. The State cannot now avoid the consequences of this choice by rewriting the charge to be one of conspiracy or accountability for criminal mischief.

¶55 I believe the Court errs in affirming the Youth Court's imposition of a restitution obligation for the aggregate damages that occurred over the entire ten-day period. I would reverse the Youth Court's order and remand with instructions to impose restitution in the amount of $16,020.63. This is the total pecuniary loss on December 26 and 27. As noted, K.E.G. conceded that he is jointly and severally liable for this amount, and he did not challenge his ability to pay it.

¶56 In conclusion, based on the foregoing, I concur in the Court's decision to reverse, but I dissent from the Court's analysis in reaching that decision and from the Court's

32

instruction to the Youth Court to consider on remand K.E.G.'s ability to pay the full

$78,702.09.[5]

/S/ LAURIE McKINNON

---

[5] According to the State's Sentencing Memorandum Regarding Restitution, the $78,702.09 figure includes amounts from outside the date range alleged in the Petition. Even if K.E.G. is responsible for all damages inflicted by all youths between December 22, 2011, and January 1, 2012—a proposition with which I do not agree—the Court fails to explain why he is also responsible for damages inflicted before December 22 and after January 1.