

DA 07-0365

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2008 MT 162

STATE OF MONTANA,

>Plaintiff and Appellee,

v.

BENJAMIN BREEDING,

>Defendant and Appellant.

APPEAL FROM:    District Court of the Eighteenth Judicial District,
In and For the County of Gallatin, Cause No. DC 2005-075
Honorable Holly Brown, Presiding Judge

COUNSEL OF RECORD:

>For Appellant:

>Hillary S. Prugh, Angel, Coil & Bartlett, Bozeman, Montana

>For Appellee:

>Hon. Mike McGrath, Montana Attorney General, Tammy K. Plubell,
Assistant Attorney General, Helena, Montana

>Marty Lambert, Gallatin County Attorney, Ashley Harrington, Deputy
County Attorney, Bozeman, Montana

Submitted on Briefs:  March 12, 2008

Decided:  May 8, 2008

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1      Benjamin Breeding was convicted of felony theft in the District Court for the Eighteenth Judicial District, Gallatin County. The District Court imposed a sentence that included $7,082.42 in restitution. Breeding appeals, contending that the District Court did not have authority to impose restitution on him of more than $1,408.89 in this case. We agree and thus reverse the court's imposition of the excess $5,673.53 in restitution.

## BACKGROUND

¶2      On January 5, 2004, Sherri Smith reported her 1993 Jeep Grand Cherokee stolen from an alley in Bozeman, Montana. Apparently, she had started the vehicle to warm it up and had left the engine running and the doors unlocked while she finished up at work. Seizing on this opportunity, Ryan Seghetti, who had just come out of the Crystal Bar, hopped in the vehicle and drove off. Seghetti went to the home of an individual identified in the record simply as "Matt," who lived in Belgrade. Breeding was at Matt's house when Seghetti arrived. Seghetti suggested that they all go for a drive, and Breeding and Matt agreed.

¶3      Seghetti eventually decided to take the Jeep off-road. While driving through a field, he hit a snow-covered haystack, causing significant body damage to the vehicle's front end. Seghetti then drove Matt back to his house, after which Seghetti suggested to Breeding that they drive to West Yellowstone or Big Sky. Breeding, however, proposed that they drive to California (where Breeding's father lived), and they decided to do that instead. Breeding was aware at this point that the Jeep had been stolen. Seghetti and Breeding took turns driving to San Diego, where Seghetti ultimately was stopped by

2

police due to a broken left-turn signal. The Jeep was impounded and eventually returned to Smith.

¶4 The Bozeman police learned through their investigation that Seghetti and Breeding were involved in the theft. Indeed, Seghetti and Breeding both admitted as much during interviews with the police in April and December 2004. The State charged Breeding with felony theft, in violation of § 45-6-301, MCA, on March 18, 2005. He initially pleaded not guilty, but the parties ultimately entered into a plea agreement under § 46-12-211(1)(c), MCA. Pursuant to the State's proposal, Breeding agreed to plead guilty to felony theft and the State agreed not to oppose a defense motion for his release on his own recognizance pending sentence. Furthermore, Breeding and the State agreed to recommend jointly that he be sentenced to the Department of Corrections ("DOC") for a period of five years, all suspended.

¶5 The District Court accepted Breeding's guilty plea on December 19, 2006, and ordered a presentence investigation. A probation/parole officer with the DOC conducted the investigation and filed a report ("PSI") on February 1, 2007. Among other things, the PSI contained a recommendation that Breeding pay restitution for damage done to Smith's vehicle. Breeding objected to this recommendation in two presentencing memoranda and again at the sentencing hearing. He asserted that of the $7,382.42 requested by Smith, $5,673.53 derived exclusively from body damage to her Jeep. He argued that he could not be charged with the $5,673.53 because Seghetti was in exclusive control of the vehicle when it was damaged; because Breeding did not assist or encourage Seghetti in driving the Jeep recklessly into the field where Seghetti hit the haystack but,

3

rather, tried to dissuade Seghetti from driving errantly and wildly; and because Breeding cannot be held liable for the damage simply by being present when it occurred. Relying on *State v. Beavers*, 2000 MT 145, ¶ 12, 300 Mont. 49, ¶ 12, 3 P.3d 614, ¶ 12, Breeding further argued that a defendant may not be ordered to pay restitution in excess of the damages caused by his criminal conduct. In this regard, Breeding emphasized that there were two distinct events related to the theft of the Jeep: first, Seghetti stole the vehicle, picked up Breeding and Matt, and then damaged it; and second, Breeding suggested that he and Seghetti drive to California in the vehicle, and Breeding participated in driving the vehicle to San Diego with knowledge that it had been stolen.

¶6 The prosecutor responded that because Breeding engaged in a "joint venture" with Seghetti to travel to California in the stolen Jeep, Breeding was "accountable" for Seghetti's actions (even though Breeding had pleaded guilty to theft, not accountability). The prosecutor also argued that "while that Jeep was in his control, whether or not he was behind the driver wheel or not, he should be held responsible, jointly and severally, of course, for the damage caused to the vehicle." The prosecutor pointed out that the Jeep was in a damaged condition at the point Breeding and Seghetti drove it to California, and he asserted that "but for" Breeding's conduct of stealing the Jeep, "this vehicle would not have been injured and the victim would not be out an additional $5,000."

¶7 The District Court decided that Breeding could be charged with the damage to the Jeep, reasoning as follows:

> In this case, Mr. Breeding apparently did not actively participate at the initial theft of the vehicle involved. However, he did participate in that he joined the co-defendant [Seghetti] on a trip to California to visit Mr.

4

Breeding's father and, at that time, he knew that the vehicle was stolen and he participated in driving the vehicle to California knowing that the vehicle was stolen. And while he was not driving at the time that the vehicle was damaged and did not necessarily encourage the conduct that resulted in the damage, the Court agrees with the State that participating in the offense does qualify Mr. Breeding as being jointly and severally responsible for the restitution for the damage in this case. The Court makes that determination after consideration of the arguments and legal principles identified by [defense counsel] in her brief. The Court agrees that it's maybe a more marginal case than sometimes and somewhat different than, for instance, the case cited of [*Sloan v. Fauque*, 239 Mont. 383, 784 P.2d 895 (1989)]. However, the Court thinks that Mr. Breeding's knowledge that the vehicle was stolen and his active participation in taking the vehicle out of state to California does make him sufficiently responsible, and that his involvement was more than just that he was simply present when the damage occurred.

Therefore, the Court finds that he should be responsible for the full amount of restitution for the damage to the vehicle, as well as the other restitution expenses requested by the victim in this matter.

¶8 The parties had agreed earlier that $300.00 of the $7,382.42 requested by Smith was for music tapes that were still in the Jeep. Therefore, the District Court reduced the $7,382.42 amount by $300.00 and imposed a restitution obligation of $7,082.42. The court stated that Breeding and Seghetti (who was sentenced in Cause No. DC-05-074) were jointly and severally responsible for this amount. Finally, the court imposed the agreed-to five-year suspended sentence. Breeding now appeals.

**ISSUE**

¶9 The sole issue on appeal is whether the District Court lacked authority to impose a restitution obligation on Breeding for the body damage to the Jeep.

**STANDARDS OF REVIEW**

¶10 With a criminal sentence (such as Breeding's suspended sentence) that is statutorily ineligible for review by the Sentence Review Division because it lacks at least

5

one year of actual incarceration, our review is two-tiered: we review the sentence for both legality and abuse of discretion. *State v. Herd*, 2004 MT 85, ¶¶ 16-23, 320 Mont. 490, ¶¶ 16-23, 87 P.3d 1017, ¶¶ 16-23. Our review for legality is confined to determining whether the sentencing court had statutory authority to impose the sentence, whether the sentence falls within the parameters set by the applicable sentencing statutes, and whether the court adhered to the affirmative mandates of the applicable sentencing statutes. *State v. Stephenson*, 2008 MT 64, ¶ 15, 342 Mont. 60, ¶ 15, 179 P.3d 502, ¶ 15. This determination is a question of law and, as such, our review is de novo. *Stephenson*, ¶ 15. A sentencing court abuses its discretion when it acts arbitrarily without employment of conscientious judgment or exceeds the bounds of reason, resulting in substantial injustice. *State v. Brotherton*, 2008 MT 119, ¶ 10, ___ Mont. ___, ¶ 10, ___ P.3d ___, ¶ 10.

¶11 We review a district court's findings of fact under the clearly erroneous standard. *State v. Weaver*, 2008 MT 86, ¶ 9, 342 Mont. 196, ¶ 9, 179 P.3d 534, ¶ 9. Findings of fact are clearly erroneous if they are not supported by substantial evidence, if the court has misapprehended the effect of the evidence, or if our review of the record leaves us with a definite and firm conviction that a mistake has been made. *Weaver*, ¶ 9.

## DISCUSSION

¶12 A district court's authority to impose sentences in criminal cases is defined and constrained by statute, and a district court has no power to impose a sentence in the absence of specific statutory authority. *State v. Setters*, 2001 MT 101, ¶ 21, 305 Mont. 253, ¶ 21, 25 P.3d 893, ¶ 21. Under §§ 46-18-201(5) and -241(1), MCA (2003), if a

6

person has been found guilty of an offense and the sentencing judge finds that any "victim" has sustained a "pecuniary loss," the sentencing judge "shall," as part of the sentence, require the offender to pay full restitution to the victim. A "victim" is a person "who suffers loss of property, bodily injury, or death as a result of . . . the commission of an offense . . . ." Section 46-18-243(2)(a)(i)(A), MCA (paragraph break omitted). "Pecuniary loss" means:

> (a) all special damages, but not general damages, substantiated by evidence in the record, that a person could recover against the offender in a civil action arising out of the facts or events constituting the offender's criminal activities . . . ;
> (b) the full replacement cost of property taken, destroyed, harmed, or otherwise devalued as a result of the offender's criminal conduct; . . . .

Section 46-18-243(1), MCA.

¶13 Thus, a sentencing judge is not only authorized, but *required* to impose a restitution obligation on the offender if a person has suffered loss of property as a result of the commission of the offense. Correspondingly, this causal standard means that an offender is not responsible for restitution for offenses that he or she did not commit. *See State v. Beavers*, 2000 MT 145, ¶¶ 9-11, 300 Mont. 49, ¶¶ 9-11, 3 P.3d 614, ¶¶ 9-11. The issue in the case at hand, therefore, is whether the damage to Smith's Jeep was a result of Breeding's offense.

¶14 A person commits the offense of theft when he or she "purposely or knowingly obtains or exerts unauthorized control over property of the owner and . . . has the purpose of depriving the owner of the property," § 45-6-301(1)(a), MCA (paragraph break omitted), or "purposely or knowingly obtains control over stolen property knowing the

7

property to have been stolen by another and . . . has the purpose of depriving the owner of the property," § 45-6-301(3)(a), MCA (paragraph break omitted).

¶15   The facts underlying Breeding's plea of guilty to this offense all relate to his driving Smith's Jeep to San Diego. According to the State's probable cause affidavit in support of the Information, Seghetti admitted he was responsible for taking Smith's Jeep from the alley; Seghetti went to Belgrade, and he, Breeding, and Matt "drove around" in the Jeep; Seghetti admitted to crashing the Jeep into a haystack; Breeding brought up the idea of traveling to San Diego in the Jeep, which the two proceeded to do; Breeding admitted that he went with Seghetti to San Diego, despite having knowledge that Seghetti stole the Jeep; and the two of them shared the driving. This recitation is consistent with the report of the investigating officer, who determined the following: Seghetti stole the Jeep from the alley in Bozeman and drove it to Matt's home in Belgrade, where he met Matt and Breeding; they rode around in the vehicle and were drunk; Seghetti admitted to wrecking the vehicle when he ran into a haystack in a field; Seghetti then dropped Matt off and told Breeding that he was going to take the vehicle to Big Sky or West Yellowstone; Breeding brought up the idea of taking the Jeep to San Diego, which they did; Breeding knew the car was stolen when he mentioned going to San Diego; and Breeding drove the vehicle at various times during the trip. At the conclusion of the report, the officer suggested that Breeding be prosecuted for felony theft on the following basis: "Breeding admitted that he knew the vehicle was stolen when he obtained control of it by driving and used the vehicle for the trip to San Diego, CA." Likewise, according to the PSI, in response to the question, "In your own words, what did you do to get

8

arrested on this charge?" Breeding responded: "I drove a stolen car when I was on my way to California to see my father."

¶16 There is nothing in the record indicating that the charge against Breeding and the offense to which he pleaded guilty were based on any of the events that occurred prior to his suggesting that he and Seghetti drive the Jeep to California and his participating in that endeavor (by driving part of the distance). As noted by the District Court in its Reasons for Sentence, Breeding "did not actively participate at the initial theft of the vehicle," Breeding "was not driving at the time that the vehicle was damaged," and Breeding "did not necessarily encourage the conduct that resulted in the damage."

¶17 The District found, and Breeding does not dispute, that he joined Seghetti on a trip to California and he knew, "at that time," that the vehicle had been stolen but he nevertheless participated in driving it to California. However, there is no evidence that Breeding "purposely or knowingly" obtained or exerted unauthorized control over the Jeep, with "the purpose of depriving [Smith] of the property," at any time prior to or contemporaneous with the vehicle's being damaged by Seghetti.

¶18 In this regard, Breeding told the investigating officer that when Seghetti arrived at Matt's house, Breeding asked Seghetti where he had gotten the Jeep and Seghetti stated that it belonged to his (Seghetti's) uncle. Furthermore, Breeding stated that he did not learn that the vehicle had been stolen until he confronted Seghetti about damaging his uncle's Jeep by driving it into the haystack, at which point Seghetti revealed that, in fact, it was a stolen vehicle. The State did not refute these statements. For that matter, the State presented no evidence that Breeding's offense of theft—which was premised on his

9

participating in driving the Jeep to California—was causally related to the earlier damage to the vehicle. The State was required to submit evidence to that effect before Breeding could be charged with paying restitution for this damage. *Cf. State v. Mikesell*, 2004 MT 146, ¶ 26, 321 Mont. 462, ¶ 26, 91 P.3d 1273, ¶ 26 ("Mikesell is entitled to have the restitution award supported by evidence."). Thus, there being no causal connection in the record between Breeding's commission of theft and the damage inflicted on the Jeep earlier by Seghetti, there is no basis for requiring Breeding to pay restitution for that damage.

¶19 The District Court stated in its Reasons for Sentence "that Mr. Breeding's knowledge that the vehicle was stolen and his active participation in taking the vehicle out of state to California does make him sufficiently responsible, and that his involvement was more than just that he was simply present when the damage occurred." Notably, the court's observation that Breeding was not just simply present when the damage occurred is inconsistent with its earlier finding that Breeding "did not necessarily encourage the conduct that resulted in the damage." In any event, while an offender is liable for restitution for offenses to which he or she has admitted, has been found guilty, or has agreed to pay restitution, *see State v. Blanchard*, 270 Mont. 11, 16, 889 P.2d 1180, 1183 (1995); *Beavers*, ¶ 8, the only offense to which Breeding has admitted, has been found guilty, and has agreed to pay restitution is the theft that occurred when he participated in driving the Jeep to California. There is no statutory authority for imputing to Breeding the damage caused in the course of Seghetti's offense. Indeed, we have previously recognized that "[a] defendant may not be ordered to pay restitution in excess

10

of the damages caused by his criminal conduct." *Beavers*, ¶ 12 (internal quotation marks omitted).

## CONCLUSION

¶20 For the foregoing reasons, we hold that the District Court lacked authority to require Breeding to pay restitution for damage to the Jeep which did not occur as a result of his offense of theft. Accordingly, the restitution obligation on Breeding's sentence to cover the cost of the damage which occurred when Seghetti drove Smith's vehicle into a haystack ($5,673.53) is illegal and must be reversed. We remand with instructions to strike this portion of Breeding's sentence.

/S/ JAMES C. NELSON

We Concur:

/S/ KARLA M. GRAY
/S/ W. WILLIAM LEAPHART
/S/ JOHN WARNER
/S/ PATRICIA COTTER
/S/ BRIAN MORRIS
/S/ JIM RICE