DA 14-0034

FILED

March 24 2015

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 14-0034

IN THE SUPREME COURT OF THE STATE OF MONTANA

2015 MT 91

STATE OF MONTANA,

        Plaintiff and Appellee,

    v.

HARRIS HIMES,

        Defendant and Appellant.

APPEAL FROM:    District Court of the Twenty-First Judicial District,
In and For the County of Ravalli, Cause No. DC 11-117
Honorable Loren Tucker, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

            Matthew G. Monforton, Monforton Law Offices, PLLC; Bozeman, Montana

        For Appellee:

            Timothy C. Fox, Montana Attorney General, Tammy A. Hinderman, Assistant Attorney General; Helena, Montana

            Jesse Laslovich, Brett O'Neil, Special Deputy Attorneys General; Helena, Montana

            William Fulbright, Ravalli County Attorney; Hamilton, Montana

                    Submitted on Briefs:  November 6, 2014
                              Decided:  March 24, 2015

Filed:

                    _____
                             Clerk

Justice James Jeremiah Shea delivered the Opinion of the Court.

¶1 Harris Himes appeals the judgment of the Twenty-First Judicial District Court, Ravalli County, sentencing him to three concurrent ten-year sentences with the Department of Corrections, with all but 90 days suspended, plus restitution and court costs, upon his convictions for three felonies: 1) failure to register as a securities salesperson; 2) failure to register a security; and 3) fraudulent practices. We affirm in part, reverse in part, and remand with instructions.

¶2 We restate the issues on appeal as follows:

1. *Whether "security" was adequately defined for the jury.*

2. *Whether the State provided sufficient evidence to prove Himes sold a security.*

3. *Whether the mens rea rule set forth in § 45-2-104, MCA, requires a mental state other than "willfully" in order to sustain a conviction for a felony.*

4. *Whether the District Court's instruction on the mental state "willfully" created a strict liability offense, and therefore the ten-year sentence for that offense violates due process.*

5. *Whether the District Court erred by giving a jury instruction for fraudulent practices that incorporated an Administrative Rule of Montana, thereby creating a different evidentiary standard for the crime of fraudulent practices than that required by statute.*

6. *Whether Himes was properly sentenced in the following respects:*

   a. *Whether the District Court abused its discretion in giving Himes a suspended sentence rather than his requested deferred sentence.*

   b. *Whether the District Court's determination of the restitution award was clearly erroneous.*

## PROCEDURAL AND FACTUAL BACKGROUND

¶3     Geoffrey Serata and Harris Himes met at Himes' ministry, Big Sky Christian Center, in Hamilton, Montana, in 2003. Serata is a disabled veteran. Himes is a retired attorney who owns and serves as senior minister at Big Sky Christian Center. Over a period of years, Serata became involved in Himes' ministry. Serata considered Himes a close friend and confidant.

¶4     Due to his disability, Serata has rarely maintained steady employment. He works odd jobs including electrical work, logging, and equipment operation. His income also includes social security disability and VA disability. When Serata met Himes, he had very little in savings and had no investments. Serata has little experience with investing and limited knowledge on the subject.

¶5     In late 2007, Serata learned that he was going to receive a distribution from his grandfather's trust, which he believed would total approximately $150,000. In December 2007, Serata contacted Himes and asked for advice about how to find a risk-free investment opportunity for his inheritance. Himes and Serata met in January of 2008 to discuss the matter. After initially suggesting an attorney and accountant to Serata, Himes asked if Serata was interested in investing in "the Lord's work." Himes began to explain many investment opportunities to Serata, all of which were intended to produce income to build churches and related facilities. Among the investment opportunities Himes discussed with Serata was a company called Duratherm.

¶6     Himes told Serata that Duratherm was a solar-panel production company which was close to starting production. According to Himes, Duratherm had a factory, the

3

necessary equipment, and buyers set to purchase the solar panels. Himes stated that the last piece Duratherm needed to begin full-scale production was a glue machine, which would cost approximately $150,000. Serata was interested in the venture, and he and Himes discussed the matter over the next three months. Himes assisted Serata in setting up a corporation sole[1] for his inheritance, which they named "Image of Truth."

¶7 In late March 2008, Serata met with Himes and James "Jeb" Bryant to further discuss Duratherm. Bryant was a friend of Himes and fellow pastor. At this meeting, Bryant presented a PowerPoint presentation explaining Duratherm's Mexico-based production capabilities. Himes and Bryant, who each held an interest in the company, offered Serata a six-percent interest in Duratherm, and they began referring to Serata as their partner. At the meeting, Serata verbally agreed to invest in Duratherm. There was no written agreement. The meeting concluded with prayer, hugs, and handshakes.

¶8 After the meeting with Bryant, Serata began requesting a written contract to memorialize his investment, and information about Duratherm's expected production capacity. In an e-mail dated May 28, 2008, Bryant wrote that Serata could conservatively expect to receive a 24 percent, or $36,000, per year rate of return on his investment.

¶9 On June 6, 2008, Serata made a wire transfer of $150,000 to Harris Bank in Illinois, at the instruction of Himes and Bryant. The beneficiary on the wire transfer was listed as Monarch Beach Properties, which Serata understood was the parent or

---

[1] A corporation sole is "a corporation having or acting through only a single member." *Black's Law Dictionary* 418 (Bryan A. Garner ed., 10th ed. 2014). In Montana, corporations sole are limited to creation under the "Montana Religious Corporation Sole Act," §§ 35-3-101, et. seq., MCA, and the sole member may be "a bishop, chief priest, or presiding elder," designated to hold property for "any religious denomination, society, or church," § 35-3-201, MCA.

4

"umbrella" company of Duratherm. Shortly thereafter, Himes prepared a "Subscription Agreement" outlining Serata's interest in Duratherm. The document contained the heading: "DURATHERM BUILDING SYSTEMS INC." The subscriber was listed as Serata's corporation sole, "Image of Truth," and included the following description of Serata's interest:

> This Subscription and Agreement, shall constitute the guarantee of issuance of a share or shares in DBS. Each share controls POINT ZERO ZERO TWO (.002) percent of the company and all ore values. It also guarantees that the subscriber shall receive POINT ZERO ZERO TWO (.002) percent royalties of the mine's defined net profits. The Subscriber is also guaranteed THREE THOUSAND (3000) shares; therefore, should the company go public and or sell, the subscriber shall be paid SIX (6) percent of the total stock trade of net sales price of any and all assets after any debt and taxes are paid.

On the last page of the Subscription Agreement, Serata's interest was listed as "POINT EIGHT THREE PERCENT (6%) [sic] ownership in DBS, LLC." Himes assured Serata that the Subscription Agreement was a temporary document, and Serata could back out at any time. Serata admitted that he did not read this document prior to signing it, but he trusted Himes as a man of God, and he understood that the document was not a binding contract.

¶10 Serata traveled to Mexico in the summer of 2008, believing he would be assisting with Duratherm's operations. Serata first met Bryant in Texas where Serata helped find vehicles to travel to Mexico. While in Texas, they purchased a glue machine for seven or eight thousand dollars. Serata then traveled to Mexico City and eventually Puerto Escondido, Mexico, the reported location of Duratherm's operations.

5

¶11 When Serata arrived in Puerto Escondido, he discovered that there was no factory ready to produce solar panels. The property they visited was a working ranch, owned and operated by friends of Bryant, consisting of mainly agricultural buildings for produce production and storage. At trial, Serata testified that what had been described as a factory ready for production was in fact a "shell of a structure," which he later discovered was not even owned by Duratherm. Still wanting to assist with the venture, however, Serata remained in Mexico for over three weeks, doing basic building maintenance. Throughout the trip, Bryant insisted that lawyers in Mexico were handling the paperwork for Duratherm, but Serata was never invited to meet with any of the Mexican lawyers regarding his investment.

¶12 During the trip to Mexico and after his return to Montana, Serata was concerned about his investment in Duratherm and made many attempts to contact Himes and Bryant regarding the conditions of the Mexico property. In an e-mail dated August 17, 2008, Serata requested a statement from Bryant outlining Duratherm's assets, the names of the other partners, their percentage of ownership and type of investment, the relationship between Duratherm and Monarch Beach Properties LLC, Monarch Beach Cloisters, and other related business matters. Bryant replied by outlining the general ownership of Duratherm, with 39% being owned by Monarch Beach,[2] and stating, "We do have

_____

[2] Bryant stated in his e-mail dated August 20, 2008, that the ownership in Duratherm was as follows: 50% held by God's Eternal Testament, a corporation sole set up by Himes and Bryant; 5% held by an individual identified only as "Filipe"; 6% held by Serata; 39% held by Monarch Beach.

[p]aperwork at the [l]awyers in Mexico and bringing on a new owner means an entirely new filing."

¶13 On August 22, 2008, Serata e-mailed Himes explaining that he felt betrayed. Serata stated Himes led him to believe his investment would purchase a glue machine for Duratherm to begin production. Serata asked to be bought out of his investment in Duratherm. On September 16, 2008, Himes replied to Serata's e-mail, stating, "I never suggested that you invest your money in Duratherm." Himes insisted that Serata was aware that Duratherm was a "start-up venture," and that Serata was never offered a partnership.

¶14 Serata reported the events to the Ravalli County Sheriff's office. Believing it was a securities-related case, the Sherriff's office referred the case to the Office of the Commissioner of Securities and Insurance of the State Auditor's Office.

¶15 Deputy Securities Commissioner, Lynne Egan, investigated Serata's case. Egan's investigation found that neither Duratherm Building Systems, Inc., nor Monarch Beach was registered to be sold as securities in the state of Montana, the other 49 states, or with the Securities and Exchange Commission. She also found that Himes was not registered to offer or sell securities in Montana.

¶16 Egan also investigated Serata's wire transfer of $150,000 to the account at Harris Bank held in the name of Monarch Beach Properties, LLC. The account's funds were used to pay four different credit card companies, various hotels, restaurants, and retail stores. Funds were also provided directly to James Bryant, his wife, and Bryant's

7

mother.  Egan found no evidence of any funds going to Duratherm, and no evidence of the account being in any way associated with Duratherm.

¶17   Himes was charged by information in Ravalli County on September 27, 2011, with six felonies: 1) theft, 2) failure to register as a securities salesperson, 3) failure to register a security, 4) fraudulent practices, 5) conspiracy to commit theft, and 6) conspiracy to commit fraudulent practices.  The State filed an amended information on December 1, 2011, to include a second charge of failure to register as a securities salesperson, but that charge was later dismissed because the statute of limitations had run.

¶18   After a one-week jury trial in Ravalli County, Himes was found guilty of three of the six felonies: 1) failure to register as a securities salesperson, 2) failure to register a security, and 3) fraudulent practices.  Himes was sentenced to three concurrent ten-year sentences with the Department of Corrections, with all but 90 days suspended, and subject to conditions.  Himes was also ordered to pay court fees and $150,000 in restitution to Serata.

¶19   Himes appealed the District Court's judgment.

## STANDARDS OF REVIEW

¶20   "The standard of review of the sufficiency of evidence to sustain a conviction is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *State v. Yuhas*, 2010 MT 223, ¶ 7, 358 Mont. 27, 243 P.3d 409.  We review a jury's verdict to determine whether sufficient evidence exists to support the verdict, not whether the evidence could have supported a different result.  *State v. Field*,

2005 MT 181, ¶ 15, 328 Mont. 26, 116 P.3d 813 (citations omitted). A claim that the State presented insufficient evidence to sustain a conviction is reviewable even if such claim was not raised below. *State v. Granby*, 283 Mont. 193, 198–99, 939 P.2d 1006, 1009 (1997).

¶21 This Court generally does not address issues raised for the first time on appeal. *State v. Longfellow*, 2008 MT 343, ¶ 19, 346 Mont. 286, 194 P.3d 694. However, when a criminal defendant's fundamental rights are invoked, we may choose to review a claim under the common law plain error doctrine where failing to review the claimed error may result in a manifest miscarriage of justice, may leave unsettled the question of the fundamental fairness of the trial or proceedings, or may compromise the integrity of the judicial process. *State v. Taylor*, 2010 MT 94, ¶ 12, 356 Mont. 167, 231 P.3d 79.

¶22 When a criminal sentence is not eligible for review by the Sentence Review Division, we review the sentence for both legality and abuse of discretion. *State v. Breeding*, 2008 MT 162, ¶ 10, 343 Mont. 323, 184 P.3d 313. Our review for legality is confined to determining whether the sentencing court had statutory authority to impose the sentence, whether the sentence falls within the parameters set by the applicable sentencing statutes, and whether the court adhered to the affirmative mandates of the applicable sentencing statutes. This determination is a question of law and, as such, our review is de novo. *Breeding*, ¶ 10. A sentencing court abuses its discretion when it acts arbitrarily without employment of conscientious judgment or exceeds the bounds of reason, resulting in substantial injustice. *Breeding*, ¶ 10.

¶23 We review de novo whether a district court had statutory authority to impose the sentence, whether the sentence falls within the applicable sentencing parameters, and whether the court adhered to mandates of the applicable sentencing statutes. *State v. Johnson*, 2011 MT 116, ¶ 12, 360 Mont. 443, 254 P.3d 578. The appropriate measure of restitution is a question of law, which we review for correctness. *Johnson*, ¶ 13. In reviewing a district court's findings of fact as to the amount of restitution, our standard of review is whether those findings are clearly erroneous. *Johnson*, ¶ 13.

## DISCUSSION

¶24 *1. Whether "security" was adequately defined for the jury.*

¶25 Himes argues that the jury was not properly instructed on the definition of "security." Specifically, he asserts that the terms "certificate of interest or participation in any profit-sharing agreement," as included in § 30-10-103(22) (2007), MCA,[3] should have been more clearly defined by the Court, citing *In re Det. of Pouncy*, 229 P.3d 678, 682 (Wash. 2010) ("Trial courts must define technical words and expressions used in jury instructions"), and *Simon v. Fribourg*, 650 F. Supp. 319, 321 (D. Minn. 1986) ("In the instant case . . . there is little authority to suggest that a 'certificate of interest or participation in a profit-sharing agreement' is a term so commonly understood and an agreement so easy to identify that it should be 'proveable by [its] name and characteristics.'"). Himes did not raise this objection in the District Court and did not

---

[3] Because Himes' crimes were committed in 2008, all references to the Montana Code Annotated are to the 2007 version of the Code.

10

preserve the issue for appeal. He urges us, however, to exercise plain error review of this alleged error.

¶26 The State contends that the jury instruction at issue merely restated statutory language, a practice which has been consistently upheld by this Court. *See, e.g.*, *State v. Hudson*, 2005 MT 142, ¶ 21, 327 Mont. 286, 114 P.3d 210 ("The District Court's jury instruction mirrored the language of the statute and thus correctly set forth the law applicable to the case."). The State also argues that plain error review is not appropriate for this matter because Himes has failed to demonstrate that the District Court's definition of "security" resulted in a fundamental miscarriage of justice or compromised the judicial process, as required for our Court to exercise plain error review, citing *Taylor*, ¶¶ 12–13.

¶27 "[T]he Securities Act: 'embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits.'" *State v. Duncan*, 181 Mont. 382, 391–92, 593 P.2d 1026, 1032 (1979) (quoting *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 299, 66 S. Ct. 1100, 1103 (1946)). The Securities Act of Montana, §§ 30-10-101, et. seq., MCA, (the Securities Act), defines "security" as follows:

> "Security" means any note; stock; treasury stock; bond; commodity investment contract; commodity option; debenture; evidence of indebtedness; certificate of interest or participation in any profit-sharing agreement; collateral-trust certificate; preorganization certificate or subscription; transferable shares; investment contract; voting-trust certificate; certificate of deposit for a security; viatical settlement purchase agreement; certificate of interest or participation in an oil, gas, or mining title or lease or in payments out of production under a title or lease; or, in general, any interest or instrument commonly known as a security, any put,

11

call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities, including any interest in a security or based on the value of a security, or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase any of the foregoing.

Section 30-10-103(22), MCA.

¶28 The instruction defining "security" that was given to the jury recited verbatim the definition set forth in § 30-10-103(22), MCA:

A "security" is any note; stock; treasury stock; bond; commodity investment contract; commodity option; debenture; evidence of indebtedness; certificate of interest or participation in any profit-sharing agreement; collateral-trust certificate; preorganization certificate or subscription; transferable shares; investment contract; voting-trust certificate; certificate of deposit for a security; viatical settlement purchase agreement; certificate of interest or participation in an oil, gas, or mining title or lease in payments out of production under a title of [sic] lease; or, in general, any interest or instrument commonly known as a security, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities, including any interest in a security or based on the value of a security, or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase any of the foregoing.

¶29 The jury instruction at issue was properly based on the statutory definition of "security" as found in § 30-10-103(22), MCA. Himes' focus on one part of the definition—"certificate of interest or participation in any profit-sharing agreement"—is misplaced. Although the State may have chosen to emphasize this part of the definition during its closing argument at trial, the jury was properly given the broader definition of "security" based on the statute. The definition provided to the jury is appropriate in light of the Securities Act's clear need for a flexible definition of security to capture a variety of money-making schemes. *Duncan*, 181 Mont. at 391–92, 593 P.2d at 1032.

¶30 Himes argues that he was prejudiced by the failure to define certain specific terms within the broader statutory definition of "security." This argument would require us to assume that the jury misunderstood the terms within the statutory definition of "security" and based its verdict on these purportedly misunderstood terms despite the lack of any evidence to that effect in the record. Without objection, the jury was properly instructed on the definition of "security" precisely as it is defined by statute. Since the jury was properly instructed on the definition of "security" precisely as it is defined by statute, we cannot conclude that the instruction resulted in a fundamental miscarriage of justice or compromised the judicial process. We therefore decline to exercise plain error review.

¶31 *2. Whether the State provided sufficient evidence to prove Himes sold a security.*

¶32 Himes raises two issues regarding his contention that the State did not provide adequate evidence to support his conviction for selling a security. First, Himes argues that there was no evidence that a certificate of interest was involved in the transaction with Serata, again referencing the specific part of the statutory definition, "certificate of interest or participation in any profit-sharing agreement," § 30-10-103(22), MCA. Next, Himes argues that the State did not prove he sold Serata a "profit-sharing agreement," citing *Fore Way Express v. Bast*, 505 N.W.2d 408 (Wis. 1993) (holding that an employee profit-sharing plan was not a "profit-sharing agreement," or an "investment contract," and therefore it was not a security subject to regulation). Himes notes that the State focused on the phrase "profit-sharing agreement" during closing arguments.

¶33 The State argues that a reasonable juror could have found that Himes sold a security based on any one of the instruments that qualifies as a "security" as defined by

13

the statute, § 30-10-103(22), MCA. In particular, the State asserts that sufficient evidence was provided to prove Himes sold Serata stock, because the instrument sold was not only referred to as "shares" in the Subscription Agreement, but it had "'some of the significant characteristics typically associated with' stock," as required by *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 686, 105 S. Ct. 2297, 2302 (1985) (quoting *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 851, 95 S. Ct. 2051, 2060 (1975)). In the alternative, the State contends that the transaction qualifies as an investment contract, citing "the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." *Duncan*, 181 Mont. at 392, 593 P.2d at 1032 (quoting *United Hous. Found.*, 421 U.S. at 852, 95 S. Ct. at 2060).

¶34 Our definition of a "security" under § 30-10-103(22), MCA, mirrors the definition in the Federal Securities Act set forth at 15 U.S.C. § 77b(a)(1).[4] In analyzing the federal definition, the United States Supreme Court has determined that while an instrument commonly referred to as "stock" most likely falls within the definition of a "security," one must also identify "'some of the significant characteristics typically associated with'

---

[4] "The term 'security' means any note, stock, treasury stock, security future, security-based swap, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a 'security,' or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing." 15 U.S.C. § 77b(a)(1).

14

stock," before the instrument is subject to regulation under the Federal Securities Act. *Landreth*, 471 U.S. at 686, 105 S. Ct. at 2302. "[T]hose characteristics usually associated with common stock [are] (i) the right to receive dividends contingent upon an apportionment of profits; (ii) negotiability; (iii) the ability to be pledged or hypothecated; (iv) the conferring of voting rights in proportion to the number of shares owned; and (v) the capacity to appreciate in value." *Landreth*, 471 U.S. at 686, 105 S. Ct. at 2302.

¶35 In the present case, a reasonable juror could have found that Himes sold a security to Serata based on the evidence adduced at trial. The jury was not required to rely on one single definition of a "security," as Himes contends. Without objection, the jury was properly instructed on the statutory definition of "security." While the State may have focused on the evidence of a profit-sharing agreement during closing argument, adequate evidence was introduced from which the jury could find that Himes sold Serata stock in Duratherm. The Subscription Agreement that Himes provided Serata identified a "guarantee of issuance" of a "(6%) ownership in DBS, LLC." The Subscription Agreement also referred to Serata's interest as "shares" and reflected that Serata may receive profits in the form of cash dividends. These are all common factors associated with stock, as articulated in *Landreth*, 471 U.S. at 686, 105 S. Ct. at 2302. Based on this evidence, a reasonable juror could have concluded that Himes sold Serata a security.

¶36 *3. Whether the mens rea rule set forth in § 45-2-104, MCA, requires a mental state other than "willfully" in order to sustain a conviction for a felony.*

¶37 Himes argues that the legislature did not intend for the Montana Securities Act to be a strict liability offense as defined in § 45-2-104, MCA; therefore, the State was

15

required to attach a mental state to each element of the offense under § 45-2-103, MCA. Himes asserts that that the definition of "willfully" used by the District Court was inappropriate for the offenses charged. The jury instruction at issue defined "willfully" as follows: "A person acts 'willfully' if the person is aware of what the person is doing. It does not mean that the person intended to violate the law, injure another, or acquire any advantage." This definition is based on § 1-1-204(5), MCA, which states that "when applied to the intent with which an act is done or omitted, [willfully] means a purpose or willingness to commit the act or make the omission referred to. It does not require any intent to violate the law, to injure another, or to acquire any advantage." Himes argues that we should follow federal law in our definition of "willful," which requires the act to be done "with knowledge that his conduct was unlawful." *Bryan v. U.S.*, 524 U.S. 184, 191–92, 118 S. Ct. 1939, 1945 (1998).

¶38 The State counters that the District Court offered the correct definition of "willfully" based on § 1-1-204(5), MCA, and the State was not required to prove that Himes had a malicious motive; the State only had to prove that Himes was aware of what he was doing. *See, e.g.*, *Erickson v. Fisher*, 170 Mont. 491, 494, 554 P.2d 1336, 1338 (1976) (holding that an act did not need a "malicious motive" to be "willful"). The State further notes that, had the legislature intended knowledge of the specific offense to be an element of the crime, it could have included such language in the code as it did in other sections of the Securities Act. *See, e.g.*, § 30-10-306(1), MCA ("Any person who . . . willfully violates 30-10-302 *knowing the statement made to be false or misleading in any material respect*") (emphasis added).

16

¶39 Under Title 45, Montana's Criminal Code, a person must have a mental state of knowingly, negligently, or purposely as to each element of an offense to be found guilty of that offense. Section 45-2-103(1), MCA. The exception to this required mental state is when "the offense is punishable by a fine not exceeding $500 or the statute defining the offense clearly indicates a legislative purpose to impose absolute liability for the conduct described." Section 45-2-104, MCA.

¶40 Titles 45 and 46 govern the construction and punishment of offenses defined outside those titles, "[u]nless otherwise expressly provided or unless the context otherwise requires." Section 45-1-103(2), MCA. The Annotator's Note to § 45-1-103(2), MCA, states that "where the definition of the offense outside the code clearly includes a particular mental state or other element, that definition controls." Montana Criminal Code of 1973 Annotated (1980 rev. ed.) § 45-1-103, MCA (Annotator's Note).

¶41 Himes was charged with violating several provisions of the Securities Act. The Securities Act falls outside Titles 45 and 46. However, it provides for criminal sanctions when any person "willfully violates" any provision of the Act. Section 30-10-306(1), MCA. Therefore, the Securities Act "includes a particular mental state."

¶42 The District Court correctly instructed the jury on the appropriate mental state to prove violations of the Securities Act. Section 30-10-306(1), MCA, expressly provides criminal sanctions when any person "willfully violates" any provision of the Securities Act. "Willfully" is defined at § 1-1-204(5), MCA, and "such definition is applicable to the same word or phrase wherever it occurs," § 1-2-107, MCA. The District Court

correctly instructed the jury in accordance with the statutory definition of "willfully." We have long upheld jury instructions which are reiterations of statutory language. *See, e.g.*, *Hudson*, ¶ 21 ("The District Court's jury instruction mirrored the language of the statute and thus correctly set forth the law applicable to the case.").

¶43  *4. Whether the District Court's instruction on the mental state "willfully" created a strict liability offense, and therefore the ten-year sentence for that offense violates due process.*

¶44  Himes contends that the use of the mental state "willfully" by the District Court rendered his crimes strict liability offenses by default. Himes argues that all crimes must have the mental states of purposely, knowingly, or negligently unless "the offense clearly indicates a legislative purpose to impose absolute liability for the conduct described," § 45-2-104, MCA. A strict, or absolute, liability offense is one which does not require proof of a mental state as an element of the offense. *Black's Law Dictionary* 453 (Bryan A. Garner ed., 10th ed. 2014). Himes essentially argues that because the District Court did not instruct the jury on one of the mental states required by § 45-2-104, MCA, his crimes did not require proof of a mental state, and became strict liability offenses by default.

¶45  Himes notes that a reasonable person must understand that his or her conduct is subject to regulation for it to qualify as a strict liability offense, and such regulation is generally for protection of the public welfare. *See, e.g.*, *U.S. v. Balint*, 258 U.S. 250, 42 S. Ct. 301 (1922) (sale of undocumented narcotics is a strict liability offense); *U.S. v. Freed*, 401 U.S. 601, 91 S. Ct. 1112 (1971) (ownership of an unregistered hand grenade is a strict liability offense); *U.S. v. Int'l Min. & Chem. Corp.*, 402 U.S. 558, 91 S. Ct.

18

1697 (1971) (shipping unregistered sulfuric acid is a strict liability offense). Himes argues that a reasonable person would not think his conduct in this case was criminal, and it should not qualify as a strict liability offense, citing *U.S. v. Apollo Energies, Inc.*, 611 F.3d 679, 687 (10th Cir. 2010) ("[W]hen persons would not reasonably foresee the items' regulations—strict liability becomes constitutionally suspect.").

¶46     The State argues that the District Court's use of the mental state "willfully" did not render Himes' crimes strict liability offenses by default. The State contends that the jury was required to find that Himes had the requisite mental state of "willfully" when he completed the offenses. Specifically, in order to convict Himes of the offenses charged, the State was required to prove that Himes was aware of his conduct—i.e., that Himes was aware he sold or offered to sell Serata an opportunity to invest in Duratherm. Therefore, the State contends that because Himes was neither charged with, nor convicted of, strict liability offenses, his challenge to the constitutionality of his sentence is misplaced.

¶47     As discussed above, the District Court used the proper mental state of "willfully," for criminal violations of the Securities Act under § 30-10-306(1), MCA. Therefore, Himes' crimes were neither charged nor tried as strict liability offenses. The jury was required to find that Himes was aware of his conduct, not that Himes' intended to violate the law. *See* § 1-1-204(5), MCA ("[W]hen applied to the intent with which an act is done or omitted, [willfully] means a purpose or willingness to commit the act or make the omission referred to. It does not require any intent to violate the law, to injure another, or to acquire any advantage.").

19

¶48 We hold that sufficient evidence existed to support the finding by the jury that Himes had the requisite mental state to violate the Securities Act. *Field*, ¶ 15. Himes offered Serata a "six-percent interest" in Duratherm, and Himes provided Serata with the Subscription Agreement which described Serata's "shares." Himes was neither charged with, nor convicted of, strict liability offenses; therefore, the ten-year sentence that was imposed did not violate his constitutional right to due process.

¶49 *5. Whether the District Court erred by giving a jury instruction for fraudulent practices that incorporated an Administrative Rule of Montana, thereby creating a different evidentiary standard for the crime of fraudulent practices than that required by statute.*

¶50 Regarding the definition of "fraudulent practices," the jury was instructed: "It is unlawful for any person, in connection with the offer or sale of any security, directly or indirectly, in, into, or from this state, to *willfully omit to provide a prospectus*."[5] (Emphasis added.) Himes contends that the requirement for a prospectus is based on an Administrative Rule, Admin. R. M. 6.10.401(1)(j), and not the statute defining fraudulent practices under the Securities Act, § 30-10-301(1)(b), MCA, which makes it unlawful for a person to "make any untrue statement of a material fact or omit to state a material fact," but the statute does not include the requirement of a written prospectus. Himes argues that the jury was allowed to erroneously rely upon the standards set by Admin. R. M. 6.10.401(1)(j), rather than statute, § 30-10-301(1)(b), MCA, and his conviction for fraudulent practices should therefore be reversed.

---

[5] A "prospectus" is "[a] printed document that describes the main features of an enterprise." *Black's Law Dictionary* 1417 (Bryan A. Garner ed., 10th ed. 2014).

¶51 The State concedes that neither the Administrative Rule nor the statute required a prospectus at the time that Himes allegedly committed the fraudulent practices with which he was charged. The State contends, however, that the inclusion of a prospectus requirement within the definition of fraudulent practices was harmless error because other sufficient evidence was presented to convict Himes for fraudulent practices pursuant to § 30-10-301(1)(b), MCA. We disagree.

¶52 The District Court erred by instructing the jury that the willful omission of a prospectus constituted fraudulent practices when neither the Administrative Rule nor the statute included such a requirement at the time that Himes is alleged to have committed the crime of fraudulent practices. Although the State characterizes this error as harmless, there is no dispute that Himes did not provide Serata with a prospectus and we cannot simply assume that the lack of a prospectus did not form the basis for the jury's conviction on this charge. We therefore reverse Himes' conviction for fraudulent practices pursuant to § 30-10-301(1)(b), MCA, and remand to the District Court for a new trial on this charge.

¶53 *6. Whether Himes was properly sentenced in the following respects:*

¶54 *a. Whether the District Court abused its discretion in giving Himes a suspended sentence rather than his requested deferred sentence.*

¶55 Himes argues that the District Court abused its discretion when it imposed a suspended sentence rather than a deferred sentence. Himes notes that he was found guilty of "nonviolent, technical offenses," and he has no criminal history. Himes further notes a letter submitted by the jury foreperson that stated, "We the jury found that there

21

was no criminal intent on the part of Mr. Himes in any of the issues before the Court in the trial." Himes contends that the District Court dismissed this letter as hearsay. Himes argues that hearsay is admissible at a sentencing hearing, and therefore the District Court abused its discretion by failing to consider the letter of the jury foreperson.

¶56 The State argues that the District Court was well within its discretion when it sentenced Himes. The State contends the District Court considered the jury foreperson's letter during the sentencing hearing. The State further contends that of particular concern to the District Court during sentencing was the position of trust Himes held in Serata's life, and that the violation of that trust caused Serata to lose $150,000 and see no return on his investment.

¶57 We hold that the District Court acted within its discretion when it imposed a suspended sentence, rather than a deferred sentence as Himes requested. The District Court properly considered the policies of punishment and public protection under § 46-18-101(2), MCA, when it determined that "some punishment [of Himes] is necessary." In regards to the jury foreperson's letter, the District Court was within its discretion to consider the letter to whatever extent it deemed appropriate at sentencing. Himes' sentence was statutorily authorized under the Securities Act, which allows for a person convicted of a criminal violation of the Securities Act to "be fined not more than $5,000 or imprisoned not more than 10 years, or both." Section 30-10-306(1), MCA.

¶58 *b. Whether the District Court's determination of the restitution award was clearly erroneous.*

¶59 Restitution for victims is one of the principles on which our sentencing and correctional policies are based. Section 46-18-101(2), MCA. Restitution payments are authorized for "any victim who has sustained pecuniary loss, including a person suffering an economic loss" as a result of a defendant's conduct under § 46-18-241(1), MCA. "As a pecuniary loss is defined to be those damages that would be recoverable in a civil action, § 46-18-243(1)(a), MCA, there must be a preponderance of the evidence supporting the restitution award." *State v. Aragon*, 2014 MT 89, ¶ 16, 374 Mont. 391, 321 P.3d 841. The Securities Act specifically allows for civil damages for the sale of unregistered securities "to recover the consideration paid for the security." Section 30-10-307(1), MCA.

¶60 Himes argues that the $150,000 restitution award was clearly erroneous because he was acquitted of the theft-related charges, and the State did not prove that there was a causal connection between his "crimes" and Serata's loss. *See State v. Brownback*, 2010 MT 96, ¶ 23, 356 Mont. 190, 232 P.3d 385 ("[R]estitution turns on the familiar elements of loss and causation."). Himes asserts that his failure-to-register convictions had no impact on Serata's loss.

¶61 The State argues that the restitution award is authorized by both the criminal procedure code under § 46-18-241, MCA, and the Securities Act under § 30-10-307(1), MCA. The State also notes that the District Court stated that Serata's property loss stemmed directly from Himes' conduct, which further warranted the restitution award. We agree.

23

¶62 The District Court stated at sentencing, "But for your conduct, Mr. Himes, there wouldn't be any need for the restitution." Himes introduced Serata to Duratherm and Bryant. Serata invested $150,000 in Duratherm, the exact amount Himes told him that Duratherm needed to purchase a glue machine to begin full-scale production. This amount reflects the consideration Serata paid for his interest in Duratherm and is appropriately recoverable under § 30-10-307(1), MCA. But for Himes' selling of the unregistered security, Serata would not have suffered this loss. The District Court's factual findings were not clearly erroneous and the order of restitution was proper.

## CONCLUSION

¶63 The District Court properly instructed the jury on the definition of "security" and applied the correct mental state regarding criminal violations of the Securities Act. The State provided sufficient evidence to support Himes' convictions for failure to register as a securities salesperson and failure to register a security. Therefore, we affirm his convictions as to those charges. The District Court erred by instructing the jury on the definition of "fraudulent practices" with a definition which was not in effect at the time of Himes' actions. We therefore reverse Himes' conviction for fraudulent practices and remand for a new trial on that charge. We affirm the District Court's sentence and restitution award to Serata.

¶64 Affirmed in part, reversed in part, and remanded with instructions for a new trial consistent with this opinion.

/S/ JAMES JEREMIAH SHEA

We Concur:


/S/ BETH BAKER
/S/ MICHAEL E WHEAT
/S/ PATRICIA COTTER
/S/ JIM RICE