FILED

06/20/2023

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 21-0406

DA 21-0406

IN THE SUPREME COURT OF THE STATE OF MONTANA

2023 MT 118

CITY OF WHITEFISH,

      Plaintiff and Appellee,

  v.

THOMAS CURRAN,

      Defendant and Appellant,

APPEAL FROM:    District Court of the Eleventh Judicial District,
In and For the County of Flathead, Cause No. DC-20-271(C)
Honorable Heidi J. Ulbricht, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Chad Wright, Appellate Defender, Kathryn Hutchison, Assistant Appellate Defender, Helena, Montana

      For Appellee:

            Austin Knudsen, Montana Attorney General, Bjorn Boyer, Assistant Attorney General, Helena, Montana

            Angela Jacobs, Whitefish City Attorney, Mary Leffers Barry, Deputy City Attorney, Whitefish, Montana

Submitted on Briefs:  March 1, 2023

Decided:  June 20, 2023

Filed:

_____
Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1 Thomas Curran appeals his Whitefish Municipal Court sentence for Operating a Motor Vehicle with a BAC of .08% or Greater (DUI *per se*), first offense. Curran argues that the Municipal Court illegally ordered him to satisfy a $600 fine using his COVID-19 stimulus payment. Curran maintains further that the Municipal Court erred when it did not consider alternative methods by which he could satisfy his fine other than a dollar-for-dollar payment. We conclude that the Municipal Court lawfully imposed the fine on Curran but mistakenly concluded that it did not have discretion to suspend the fine or to enforce the fine through an alternative method of payment. We accordingly reverse and remand for the court to consider such alternatives.

**FACTUAL AND PROCEDURAL BACKGROUND**

¶2 On March 8, 2020, Curran was cited for Driving Under the Influence and Reckless Driving. Curran pleaded guilty to an amended misdemeanor charge of first-offense DUI *per se*.[1] As part of his plea deal, Curran agreed to the minimum $600 fine and an $85 surcharge, with the understanding that he would ask the court to consider his ability to pay the fine.

¶3 The Municipal Court held a sentencing hearing on August 11, 2020. Curran's counsel requested that the court suspend Curran's fine entirely due to his inability to pay.

---

[1] Curran was sentenced to a DUI *per se* pursuant to § 61-8-406(1)(a), MCA, which was repealed January 1, 2022. Curran is subject to the penalties described in § 61-8-722, MCA, that were in effect at the time of his offense. *State v. Johnson*, 2011 MT 286, ¶ 13, 362 Mont. 473, 265 P.3d 638.

2

Curran advised that he collected $1,105 in social security benefits each month, that his rent amounted to $650 monthly, and that due to medical expenses he constantly exceeded his monthly income. The 73-year-old Curran explained that he was out of work due to a back injury and that his injury prevented his continued work as a certified nursing aide. Curran testified that he would need to "probably . . . get some kind of work," but based on his injury he did not know what work he would be capable of performing. Curran further testified that he owned property in the form of a functional vehicle and an inoperable vehicle, and he received the initial COVID-19 stimulus payment. Curran told the Municipal Court that he could apply $300 of his $1000 bail bond towards the fine, leaving a balance of $300. Based on this testimony, the Municipal Court found that Curran had the ability to pay the fine. The Municipal Court discussed with Curran the possibility that he might receive a second COVID-19 stimulus payment and that he could use this stimulus payment to settle his fine.

¶4     Though sympathetic to Curran's financial situation, the Municipal Court did not believe it possessed discretion to do anything other than impose the $600 fine. The court accordingly sentenced Curran to ten days of incarceration with all but one day suspended, completion of the Assessment, Court, and Treatment Program, and a $600 fine. The court waived the $85 statutory surcharge. The court then set a status hearing "regarding time pay review" for October 9, 2020. The court stated, "[I]f you don't receive stimulus money, if you don't get back to work, if you don't have any other income, then we'll talk about it in 60 days."

3

¶5 Curran appealed his sentence to the District Court the same day the court issued its sentencing order. Curran argued that the Municipal Court erred "by imposing a fine, despite [his] inability to pay." Curran cited *State v. Mingus*, 2004 MT 24, 319 Mont. 349, 84 P.3d 658, arguing that even if sentencing courts must impose a mandatory fine under existing precedent, the courts retain "wide discretion" to order a defendant to satisfy the fine via alternatives to dollar-for-dollar payment. Curran maintained that, rather than order him to pay $600, the Municipal Court could have ordered that he participate in community service, suspend the fine subject to "appropriate conditions," or even incarcerate him at a rate of $75 per day. Irrespective of *Mingus*, Curran maintained the Municipal Court erred because it ordered that he pay the fine via his protected COVID-19 stimulus payment.

¶6 The District Court affirmed the Municipal Court, holding that the "sentencing condition falls within statutory parameters, was within the court's statutory authority, and the court followed the mandates of applicable sentencing statutes in imposing the fine." The District Court considered the evidence presented before the Municipal Court that Curran "was employed until the month of the offense, that he both could work and understood that he needed to work, that he had disposable property, and that he had $1000 on deposit with the court." It concluded that, though the Municipal Court considered Curran's ability to pay, it was not required to do so because Curran was sentenced to a mandatory minimum fine. Curran appeals the District Court's decision to affirm the fine.

4

**STANDARDS OF REVIEW**

¶7    "We review decisions by a district court acting as an appellate court as if originally appealed to this Court." *City of Kalispell v. Salsgiver*, 2019 MT 126, ¶ 11, 396 Mont. 57, 443 P.3d 504 (citations omitted).

¶8    "The Court reviews fines the same as sentencing conditions." *State v. Ingram*, 2020 MT 327, ¶ 8, 402 Mont. 374, 478 P.3d 799 (citing *State v. Reynolds*, 2017 MT 317, ¶ 15, 390 Mont. 58, 408 P.3d 503).  We review sentences of less than one year of incarceration both for legality and for abuse of discretion.  *State v. Himes*, 2015 MT 91, ¶ 22, 378 Mont. 419, 345 P.3d 27 (citing *State v. Breeding*, 2008 MT 162, ¶ 10, 343 Mont. 323, 184 P.3d 313).  "Whether a sentence is legal is a question of law that we review de novo to determine whether the court's interpretation of the law is correct."  *State v. Daricek*, 2018 MT 31, ¶ 7, 390 Mont. 273, 412 P.3d 1044 (citation omitted).  "A sentencing court abuses its discretion when it acts arbitrarily without employment of conscientious judgment or exceeds the bounds of reason, resulting in substantial injustice."  *Salsgiver*, ¶ 12.

**DISCUSSION**

¶9    Curran pleaded guilty to § 61-8-406(1)(a), MCA (2019), prohibiting persons from driving a noncommercial vehicle while their blood, breath, or urine alcohol concentration is .08 percent or higher.  Curran's guilty plea exposed him to the penalties found in § 61-8-722(1), MCA (2019): "[A] person convicted of a first violation of 61-8-406 or 61-8-411 shall be punished by imprisonment for not more than 6 months and by a fine of not less than $600 or more than $1,000[.]"

¶10     On appeal, Curran argues that the Municipal Court erred when it "ordered" Curran to pay his $600 fine using "an emergency COVID-19 relief payment" and violated § 46-18-231(3), MCA, when it sentenced him, believing that it did not possess the authority to consider alternatives to Curran's dollar-for-dollar payment of the mandatory fine. Curran contends that Montana law requires sentencing courts to consider alternatives to a defendant's monetary satisfaction of a fine. He argues further that failing to require sentencing courts to analyze a defendant's method of payment would render sentencing statutes unconstitutional when imposed on defendants who cannot pay.

¶11     The State counters that the Municipal Court did not require Curran to pay his fine using protected benefits. It contends that even if the court did order Curran pay with his COVID-19 stimulus money, this case would not be ripe for judicial review because his COVID-19 stimulus money was "hypothetical." It maintains that the Municipal Court lawfully imposed the $600 fine on Curran and that, when doing so, the court need not have considered Curran's ability to pay, in line with this Court's precedent. Further, the State points out that Curran raises his constitutional argument for the first time on appeal to this Court and urges the Court not to consider it.

¶12     *Issue One: Did the Municipal Court impose an illegal sentence on Curran?*

¶13     We consider first the legality of the fine imposed against Curran. A sentence is legal when it "falls within the statutory parameters, . . . the . . . court had statutory authority to impose the sentence, and . . . the . . . court followed the affirmative mandates of the applicable sentencing statutes." *State v. Yeaton*, 2021 MT 312, ¶ 8, 406 Mont 465, 500 P.3d 583 (quoting *Ingram*, ¶ 8) (citation omitted).

6

¶14　Curran does not challenge the statutory $600 fine as a mandatory minimum for a first-offense DUI *per se*. *See* § 61-8-722(1), MCA (2019). Though he agrees the fine is mandatory, Curran argues that his sentence is illegal because the Municipal Court "ordered" that Curran pay his fine using his COVID-19 stimulus checks in its oral pronouncement of his sentence.

¶15　In *State v. Eaton*, this Court held unlawful a sentence ordering monthly restitution paid at twenty percent of the defendant's net income from any source because it included money received from Eaton's social security benefits, which are protected from "other legal process"—including court fines and costs. 2004 MT 283, ¶¶ 24-25, 323 Mont. 287, 99 P.3d 661 (citing 42 U.S.C. § 407(a)). We have yet to consider a case involving COVID-19 stimulus payments in the same situation. We conclude—based on an administrative provision attached to the act authorizing the COVID-19 stimulus payments—that the stimulus payment at issue enjoys a similar protection as payments issued pursuant to the Social Security Act. Additional 2020 Recovery Rebates for Individuals, 26 U.S.C. § 6428A, Administrative Provisions (2)(a) (2020) ("[N]o applicable payment shall be subject to, exaction, levy, attachment, garnishment, or other legal process[.]"). It would therefore be improper for a sentencing court to order a defendant to pay a court imposed fine, cost, or restitution directly from a COVID-19 stimulus payment.

¶16　Review of the record—both the oral sentencing proclamation and written corrected sentencing order—reveals that the Municipal Court did not order Curran to pay his fine using his COVID-19 stimulus money. When a written sentence conflicts with the sentence orally imposed and "substantively increases the defendant's loss of liberty or . . . sacrifice

7

of property," the oral sentence controls. *State v. Kroll*, 2004 MT 203, ¶ 20, 322 Mont. 294, 95 P.3d 717. Curran does not challenge his sentence on the specific grounds that the oral pronouncement at sentencing conflicted with the written order. But he does argue that his sentence contained an oral directive that he pay the fine using his COVID-19 stimulus funds; we thus consider whether the oral sentence differed from the written judgment, which does not reflect such a requirement.

¶17 The Municipal Court discussed Curran's COVID-19 stimulus money with the parties during the sentencing hearing. It confirmed that Curran received a payment during the first round of COVID-19 stimulus checks. It also considered the possibility that Curran would receive a second COVID-19 stimulus payment in the future. The court talked to Curran about using funds received from the COVID-19 stimulus program to pay his fine. At one point, the Municipal Court offered to put in Curran's time pay agreement that "if [he] receive[d] another stimulus payment it can be due-payment at that time." The court's suggestion, however, did not make it into the final sentence proclamation. The Municipal Court did not include a requirement that Curran use his funds from his COVID-19 stimulus payments to satisfy his fine in either its oral proclamation or written judgment.

¶18 Notably, the written judgment does not mention the potential second round of COVID-19 stimulus money. The written judgment serves as "evidence of the sentence orally pronounced." *State v. Lane*, 1998 MT 76, ¶ 40, 288 Mont. 286, 957 P.2d 9. Any ambiguities perceived by Curran when the Municipal Court discussed using his stimulus funds to pay for the fine were clarified in the written corrected sentencing order. This order addressed the court's consideration of Curran's ability to pay the fine: "Defendant posted

a cash bond, has additional sources of income besides social security, and testified to his ability to pay fines in accordance with the time pay agreement executed herewith."[2]

¶19 Curran maintains that the only realistic way he could pay the fine is to use money he receives from protected payments: either his social security benefits or his COVID-19 stimulus money. The Municipal Court, therefore, practically ordered him to use protected benefits to satisfy the fine.

¶20 We have recognized that "income sources can change over time," and there is a difference between a sentencing court "creating a debt and requiring [protected] benefits be used to satisfy a debt." *Yeaton*, ¶ 11 (citing *Ingram*, ¶¶ 11-12). The Municipal Court adhered to statutory parameters and followed our precedent when it created a debt for Curran by imposing the required fine but did not require that he use protected benefits to satisfy this debt. The court considered Curran's ability to pay beyond his protected benefits. It discussed with Curran his need to obtain employment and applied his bail bond to half the fine. Further, at the sentencing hearing, Curran agreed he could pay the fine if he partook in a time pay agreement. The Municipal Court did not order that Curran use his protected benefits to pay this mandatory fine. The sentence therefore was statutorily

---

[2] The Time Pay Agreement was not part of the record before the District Court or before this Court when Curran submitted his Opening Brief. Without requesting to supplement the record on appeal, the State supplied the Clerk of Court with the Time Pay Agreement, citing to it in its Response Brief as proof that the Municipal Court did not order Curran to use "prospective stimulus money." We admonish the State for circumventing the appropriate appellate rules for supplementing the record, and we will not consider the contents of the Time Pay Agreement when deciding this issue. M. R. App. P. 8(1), (6).

authorized and was not illegal. *See Yeaton*, ¶¶ 11, 27; *Eaton*, ¶¶ 23-37; § 61-8-722(1), MCA (2019).

¶21 We have held that a sentencing court does not exercise discretion when it imposes a mandatory fine, "irrespective of the defendant's ability to pay[.]" *Ingram*, ¶ 9 (quoting *Mingus*, ¶ 15); *see State v. Reynolds*, 2017 MT 317, ¶ 19, 390 Mont. 58, 408 P.3d 503 (statutorily mandated fines are not subject to a sentencing court's discretion). Curran does not take issue with this precedent, and we do not reconsider it here.[3]

¶22 *Issue Two: Did the Municipal Court abuse its discretion by not considering alternatives to Curran's monetary fine?*

¶23 Curran argues next that, pursuant to § 46-18-231(3), MCA, the Municipal Court had discretion to impose an alternative to satisfy Curran's obligation for the $600 fine; it therefore erred when it believed that it could not substitute a different "method of payment" for the dollar-for-dollar fine it ordered. Curran contends that a constitutional reading of § 46-18-231(3), MCA, requires a sentencing court to assess a defendant's ability to pay when considering the method of payment.

¶24 Section 46-18-231(3), MCA, requires that sentencing courts consider "the nature of the crime committed, the financial resources of the offender, and the nature of the burden that payment of the fine will impose" when assessing the amount and method of payment towards a fine. Though this section adds that a sentencing court "may not sentence an

---

[3] The Court is not "blind" to the systemic issues surrounding the imposition of fines and fees on indigent defendants. *See Dissent*, ¶ 3. The Dissent raises important policy issues regarding the cyclic impacts of poverty in the criminal justice system. *See Dissent*, ¶¶ 3-16. We address Curran's case, however, on the arguments made in the District Court and the issues raised and briefed on appeal.

offender to pay a fine unless the offender is or will be able to pay the fine[,]" we have held that a sentencing court does not have discretion to waive a statutorily mandated fine. *See Mingus*, ¶ 15. Our precedent has not, however, removed a sentencing court's discretion when it comes to the method of payment a defendant may use to satisfy a mandatory fine.

¶25 The State concedes that, even though the statute prescribing penalties for the charged offense mandates imposition of a fine, the Municipal Court had "the authority to suspend Curran's fine or order donation to the food bank" in lieu of monetary payment. *See* § 46-18-201(2)(a), (3)(b), MCA. Section 46-18-201, MCA, the general sentencing statute for criminal offenses, provides in part that "[w]henever a person has been found guilty of an offense . . . a sentencing judge may suspend execution of sentence . . . [unless] otherwise specifically provided by statute[.]" Section 46-18-201(3)(b), MCA, permits a sentencing court to allow "part or all of a fine to be satisfied by a donation of food to a food bank program." We assess statutory requirements in the context of holistic statutory schemes "to pursue the Legislature's intent and to avoid an absurd result." *See State v. Lodahl*, 2021 MT 156, ¶ 16, 404 Mont. 362, 491 P.3d 661. Section 61-8-722(1), MCA (2019), does not "specifically provide[]" that a sentencing court may not suspend the mandatory sentence for a first-offense DUI *per se*, nor does it prohibit a sentencing court from satisfying the mandatory fine with a food bank donation. Section 46-18-201(2)(a), (3)(b), MCA.

¶26 At Curran's sentencing, the city attorney did not object to defense counsel's suggestion that the Municipal Court suspend Curran's fine. The Municipal Court,

11

however, did not believe that it possessed this authority, concluding that it had no choice but to impose a dollar-for-dollar sentence of $600 on Curran.

¶27 "Failure of a . . . court to exercise discretion is itself an abuse of discretion." *Clark Fork Coal. v. Mont. Dep't of Envtl. Quality*, 2008 MT 407, ¶ 43, 347 Mont. 197, 197 P.3d 482 (citing *State v. Weaver*, 276 Mont. 505, 509, 917 P.3d 437, 440 (1996) (other citation omitted)). Here, the Municipal Court did not believe that it had discretion to suspend or otherwise order an alternative to the mandatory $600 fine. Sentencing courts do have this discretion. *See* § 46-18-201(2)(a), (3)(b), MCA. By not recognizing that it had discretion, the Municipal Court abused its discretion. *See Weaver*, 276 Mont. at 509, 917 P.2d at 440.

¶28 The State argues that reversing due to the sentencing court's failure to consider alternatives to the dollar-for-dollar payment of the mandatory fine would "effectively overrule this Court's holdings in *Mingus*, *Reynolds*, *Ingram*, and *Yeaton*." We disagree. Whether a sentence must be imposed on a defendant because the Legislature has codified a mandatory punishment is not the same as a court's discretion regarding how defendants may satisfy mandatory sentences when the statutes also afford that discretion. Our line of precedent regarding a sentencing court's obligation to impose a mandatory fine does not prevent sentencing courts from determining the method of satisfying a fine once imposed.

¶29 Curran also raises a concern that if courts fail to apply discretion when considering the method of payment, the sentencing statutes could be used to impose unconstitutional fines. Curran did not raise any constitutional argument before the Municipal Court or, importantly, before the District Court on appeal. Curran does not argue that the statute itself is unconstitutional; he argues that it is unconstitutional when applied to someone like

12

him who lacks the ability to pay the fine. We do not address as-applied constitutional arguments when raised for the first time on appeal. *Ingram*, ¶ 10. We therefore decline to address Curran's constitutional argument.

**CONCLUSION**

¶30 The Municipal Court abused its discretion by not recognizing that it possessed the discretion to order Curran to satisfy the mandatory fine via alternative methods to a dollar-for-dollar repayment plan. We therefore remand to the District Court with instructions to remand the case to the Municipal Court for consideration of alternative methods authorized by statute for satisfying the fine.

/S/ BETH BAKER

We Concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ JIM RICE

Justice James Jeremiah Shea, concurring.

¶31 While I struggle to find a point of disagreement with the substance of Justice McKinnon's eloquent dissent, I concur with the Court's Opinion because, as the Court correctly notes, we are confined to "address[ing] Curran's case . . . on the arguments made in the District Court and the issues raised and briefed on appeal." Opinion, ¶ 21 n.3. With that caveat being noted, I have little doubt that this issue will be squarely presented to us in the future and that Justice McKinnon's words will be cited back to us.

/S/ JAMES JEREMIAH SHEA

13

Justice Laurie McKinnon, dissenting.

¶32　I cannot subscribe to the Court's reasoning and its willingness to further entrench artificial distinctions in our law between imposition of a debt and "requiring [protected] benefits be used to satisfy a debt," Opinion, ¶ 20 (citing *State v. Yeaton*, 2021 MT 312, ¶ 11, 406 Mont. 465, 500 P.3d 583; *State v. Ingram*, 2020 MT 327, ¶¶ 11-12, 402 Mont. 374, 478 P.3d 799); between imposing a debt and enforcing payment on that debt, Opinion, ¶ 20; by placing significance on Curran, during the power imbalance of a sentencing hearing, expressing a willingness to cooperate with the sentencing court when he entered a time pay agreement, Opinion, ¶ 20; by reaffirming *State v. Mingus*, 2004 MT 24, 319 Mont. 349, 84 P.3d 658, and decisions relying on *Mingus* that draw an artificial and unrealistic distinction between imposing a debt and enforcing a debt, Opinion, ¶¶ 20-21; and by declaring *Mingus* is not at issue because Curran has not raised it, although *Mingus* is the cause of these tortured proceedings.  Opinion, ¶ 21.  The Court holds that "Curran does not take issue with this precedent, and we do not reconsider it here[,]" declaring that the Municipal Court imposed a legal fine.  Opinion, ¶ 21.  Here, both the Municipal Court and the District Court found dispositive *Mingus*'s holding that a sentencing court cannot exercise discretion to consider a defendant's ability to pay when it imposes a mandatory fine.  *Mingus*, and its issue *Ingram*, are the elephants in the room—which Curran agues can be reconciled with other precedent, *State v. Eaton*, 2004 MT 283, 323 Mont. 287, 99 P.3d 661, and *State v. Yang*, 2019 MT 266, 397 Mont. 486, 452 P.3d 897, if the court employs discretion at a different stage of the proceeding, i.e., the enforcement phase.

14

Imposition of fines and fees and their enforcement cannot be considered in isolation without doing injustice to individuals when they are sentenced by the court.

¶33 The Court's distinction ignores the reality of indigency and the entrapment of indigent persons, many of whom are frequently marginalized in the criminal justice system. Compared to persons with resources, an indigent defendant—even when discretion is exercised in the method of payment—will remain entangled in the criminal justice system longer, remain incarcerated longer, have escalating debt, have increased probationary obligations, and, for many, may end up homeless. Moreover, these disparate impacts will likely affect family members. Here, Curran's sister has already helped him meet his basic living needs.

¶34 The plight of indigency, and the inequities and disparate impacts of *imposing* the same mandatory fine on every defendant, do not disappear because a court adjusts the method by which the fine will be paid. Adjusting the method of payment may include *lengthening* the period of probation to ensure there is enough time to make payments; *reconsidering* at a *revocation* an adjustment thus undermining the determinate nature of sentencing; or considering alternative ways to "pay back" society for a crime, such as community service or a donation to the food bank. Very simply, a defendant without financial resources is impacted differently than a defendant with financial resources, because a financial obligation involves money. An indigent defendant such as Curran, who remains criminally obligated to pay the same fine, *but cannot pay it*, risks getting caught in an endless cycle of escalating debt, needless incarceration, and endless entanglement with the justice system—unlike a defendant who has financial resources. A defendant with

the financial wherewithal to pay a legal financial obligation (LFO) does not have to decide between paying the criminal justice system or adequately feeding his children, purchasing necessary medication, or foregoing life's necessities. An indigent defendant must continue to worry about a revocation and a longer involvement with the justice system. The Court provides: the Municipal Court "followed our precedent when it created a debt for Curran by imposing the required fine[,]"Opinion, ¶ 20, (because we allow imposing mandatory minimum fines on indigent persons, under *Mingus* and *Ingram*); that a mandatory minimum may be suspended and a defendant placed on probation, Opinion, ¶ 25, (although a wealthier defendant could avoid prolonged supervision by paying the fine); that a defendant's "income sources can change over time," Opinion, ¶ 20, (despite indigency increasing nationally and, here, that Curran is age seventy-three, disabled, unemployed, and with no assets to speak of); and that Curran could satisfy his mandatory fine "with a food-bank donation[,]" Opinion, ¶ 25, (although Curran likely could benefit from a food bank donation himself). In my opinion, the Court's blind adherence to an artificial distinction between *imposition* of a debt and how it is *enforced* ignores very important realities of poverty. The Court remains blind to the inequities and disparate impacts of imposing mandatory fines and fees on persons who are clearly and obviously impoverished. The Court continues to maintain its dogged and unenlightened distinction of "creation/imposition" and "collection/enforcement" based on legal rhetoric, which is disturbing given the tortuous way this precedent is being applied in the lower courts.

¶35    While I agree with the Court that the COVID-19 stimulus payments enjoy the same protection as the Social Security Act, I disagree that when a sentencing court clearly relies

16

on those payments in assessing a defendant's ability to pay but omits from the written judgment the words "including stimulus monies," that the written judgment is controlling. *See State v. Lane*, 1998 MT 76, ¶ 40, 288 Mont. 286, 957 P.2d 9 (concluding where the oral sentence and the written sentence differ, the oral sentence will control). As Curran points out, the only way he could pay his fine was by using his protected Social Security payment and his stimulus checks. Here, it is undeniable that the Municipal Court used both his stimulus checks and his Social Security payment in its ability-to-pay analysis. Yet even considering those payments, Curran is still indigent and has no ability to pay the mandatory fine.

¶36 Courts have long been sensitive to the treatment of indigent persons in our criminal justice system. Justice Hugo Black, over a half-century ago, declared that "[t]here can be no equal justice where the kind of trial a man gets depends on the amount of money he has." *Griffin v. Illinois*, 351 U.S. 12, 19, 76 S. Ct. 585, 591 (1956) (plurality opinion). In *Griffin*, the United States Supreme Court struck down a state practice of granting appellate review only to persons able to afford a trial transcript. *Griffin*, 351 U.S. at 19, 76 S. Ct. at 591. The Court has since held that indigent persons are entitled to counsel on direct appeal, *Douglas v. California*, 372 U.S. 353, 83 S. Ct. 814 (1963); that indigent persons are entitled to a free transcript of preliminary hearings for use at trial, *Roberts v. LaVallee*, 389 U.S. 40, 88 S. Ct. 194 (1967); that indigent persons cannot be denied an adequate record to appeal a conviction under a fine-only statute, *Mayer v. Chicago*, 404 U.S. 189, 92 S. Ct. 410 (1971); and that a state cannot subject a certain class of convicted defendants to a period of imprisonment beyond the statutory maximum solely because they are too

poor to pay the fine, *Williams v. Illinois*, 399 U.S. 235, 90 S. Ct. 2018 (1970). *Williams* was extended in *Tate v. Short*, 401 U.S. 395, 91 S. Ct. 668 (1971), which held that a state cannot convert a fine imposed under a fine-only statute into a jail term solely because the defendant is indigent and cannot immediately pay the fine in full. Finally, in *Bearden v. Georgia*, 461 U.S. 660, 103 S. Ct. 2064 (1983), the Court held that a sentencing court cannot properly revoke a defendant's probation for failure to pay a fine and make restitution, absent evidence and findings that he had the ability and resources to pay it.

¶37 Even though the Court has been sensitive to the plight of indigency, the Court has placed limits on protections afforded to indigent defendants, such as in *Ross v. Moffitt*, 417 U.S. 600, 94 S. Ct. 2437 (1974), where the Court held that indigent defendants had no constitutional right to appointed counsel for a discretionary appeal, and *United States v. MacCollom*, 426 U.S. 317, 96 S. Ct. 2086 (1976) (plurality opinion), which rejected an equal protection challenge to a federal statute which permitted a district court to provide an indigent defendant a free trial transcript only after the court certified the challenge was nonfrivolous and the transcript was necessary to prepare the petition.

¶38 Due process and equal protection principles ground a court's inquiry into the appropriateness of any penalty that is imposed. We have individualized sentencing in this country. In imposing a penalty, a sentencing court should consider the nature of the individual interest affected, the extent to which it is affected, the rationality of the connection between legislative means and purpose, and the existence of alternative means for effectuating the penological purpose. A fine is only one method by which a defendant is held accountable to society for his crime. Generally, the fairness of relations between

18

the criminal defendant and the State are analyzed under due process principles, while the question of whether the State has invidiously denied one class of defendants a substantial benefit available to another class of defendants is analyzed under the Equal Protection Clause. However, cabining the inquiry as one of either due process or equal protection narrowly focuses the issue on the criminal defendant vis-à-vis the State or the criminal defendant vis-à-vis other defendants, thus ignoring the disparate impact on an indigent's family members when imposing a fine; the casual relationship and nexus between indigency, homelessness, and incarceration; and how monetary sanctions contribute to economic inequality and racial injustice. Over the past 50 years, state and federal penal policies have sought to limit judicial discretion by enacting mandatory minimum sentencing statutes, imposing fixed sentencing grids, and predetermining fine and fee schedules with the express goal of obtaining equality in sentencing. Here, and in American jurisprudence, mandatory minimum fines, uniform sentencing practices, and rule equality are accepted as legitimate because they are uniform and therefore *appear* to be equal, despite their unequal impact.

¶39　Monetary sanctions present fundamental challenges to the notion of fairness and equality when they are imposed without consideration of a defendant's ability to pay. LFOs consist of fines, fees, restitution, costs, surcharges, and other financial penalties imposed upon a defendant who has become involved in the criminal justice system. The imposition of LFOs, especially for low-level misdemeanor charges, is more widespread than any other form of sanction.

¶40    In a market economy, income, wealth, and credit are distributed unequally and successful navigation of the criminal justice system requires defendants to have access to financial resources, cash or credit, and income potential—all of which is acquired through the market.  "Inequalities in the labor and credit markets, which reflect historic and ongoing racial, ethnic, and other forms of discrimination, are thus replicated in the criminal legal system uniquely through monetary sanctions."[1]

¶41    LFOs not only impact defendants from marginalized groups, but existing research shows that the negative impact of LFOs likewise extends beyond a defendant to their family and relatives.[2]  People convicted of crime are often treated as atomistic individuals by the criminal justice system, and the fact that they are largely embedded in social networks is ignored by criminal justice actors.  Family members are often negatively impacted by their relative's punishment despite not having violated any laws themselves.  Symbiotic harm refers to the unintended negative effects of punishment on the intimate associations of justice-involved individuals.

¶42    The impact of incarceration on family members has been well-researched and documented—divorce, economic hardship, children with an incarcerated parent reaching lower educational levels, higher body mass indexes, and discomfort associated with visiting loved ones in prison.  While LFOs are one of the most common forms of

[1] Lindsay Bing, Becky Pettit, & Ilya Slavinski, *Incomparable Punishments: How Economic Inequality Contributes to the Disparate Impact of Legal Fines and Fees*, 8 RSF: The Russell Sage Found. J. Soc. Scis. 2, 120 (2022).

[2] Daniel J. Boches, et al., *Monetary Sanctions and Symbiotic Harms*, 8 RSF: The Russell Sage Found. J. Soc. Scis. 2, 101 (2022).

punishment, they are unique because they are the only sanction that can be endured by people other than the convicted person. A family member cannot serve time on behalf of a relative but can pay their fines and fees. Thus, there is a distinction between LFOs and other forms of punishments. The "law requires payment of [monetary sanctions], but is indifferent to who makes it. Unlike other penal sanctions, which are personal in nature, the costs imposed by money sanctions are transferable."[3] The vast scope and transferable nature of modern LFOs function to stretch the costs of LFOs far and wide, and beyond those convicted of crime. Family members often pay the legal debt of loved ones, which include not only the LFO itself but commissary and telephone fees accrued while incarcerated; court, probation, and jail fees; ankle monitoring and drug treatment fees; bail; and restitution.

¶43    Moreover, often family members find themselves in financially precarious positions because of paying a relative's LFO. This can take the form of emptying a retirement account, using tax refunds, selling property, or incurring debt and interest to pay the LFO. State actors can pressure, threaten, and leverage incarceration of their loved ones if the family member does not pay the LFO. LFOs can also engender conflict between the defendant and their family because money that was previously directed for household expenses is now reallocated to payment of the LFO. Finally, legal debt can cause conflict between the innocent family member and court actors, extending the reach of the criminal justice system into the defendant's household.

---

[3] Daniel J. Boches, et al., *Monetary Sanctions and Symbiotic Harms*, 8 RSF: The Russell Sage Found. J. Soc. Scis. 2, 100 (2022).

¶44 People with LFOs have a higher average household size than those without. Most LFOs are not homeowners, and many have an adult child in the household, live with a parent, or live with other family and nonfamily individuals. Those with LFOs move more frequently than those without and renters who moved because of eviction, landlord actions, or missed rent payments were evicted three to five times more if they had an LFO than for those who did not. Renters with LFOs stayed renters longer because they could not save or qualify for mortgages as easily as those without LFOs.[4] People who live with court debt are more likely to experience housing insecurity that corresponds to living with family members and friends, residential mobility, barriers to home ownership, struggling to pay for housing, and homelessness. Moreover, housing instability leads to criminal legal involvement because of conflict and stress, frequent mobility, changing and multiple household members, and the general stressors that come within the overall context of economic fragility.[5] Monetary sanctions are a ubiquitous part of criminal sentencing that directly reduce household resources available to pay for the most basic of provisions.

¶45 In a study addressing monetary sanctions and housing instability, a 22-year veteran prosecutor was interviewed and described a courtroom episode that deeply affected him. He began by saying: "I will tell you one story that literally brought the courtroom to tears," and then continued:

---

[4] Mary Pattillo, et al., *Monetary Sanctions and Housing Instability*, 8 RSF: The Russell Sage Found. J. Soc. Scis. 2, 62-63 (2022).

[5] Mary Pattillo, et al., *Monetary Sanctions and Housing Instability*, 8 RSF: The Russell Sage Found. J. Soc. Scis. 2, 65 (2022).

A young man was ordered to pay restitution for a theft. . . . It was Safeway who was the victim, and it was about $300. He was engaged in a shoplifting and had broken a window in attempt to get away. Comes in, the judge says, "are you prepared to make a payment today? I noticed you haven't made a payment." And he says, "Yes, I have a payment to make." Judge directs him to pay his $20 to the court officer.

[The judge asks,] "Okay. Um, can you continue to make $20 payments?" The defendant said, "I don't know." "Well, why don't you know" Are you employed?" "No, not really." "Where do you live?" . . . "I live behind the church." "Okay, so you're saying you're effectively homeless." "Yes." "Where'd you get the $20 for today?" "I don't wanna say." "I need you to say. Tell me where you got the $20." "Well, I did something for it." "What do you mean you did something? Did you steal it?" "No, ma'am. I didn't steal it." "How'd you get it?" "I sold myself."

Judge says, "You sold yourself to get $20 to pay restitution?" He said, "Yes." "How'd you get here today?" "I took BART." "Did you pay for BART?" "No ma'am." "Then, how'd you get here?" "I jumped the turnstile." "So, you sold yourself and committed an infraction to come here and pay me $20?" "Yes, ma'am." "And you don't have a place to live tonight?" "No, ma'am." "Give him his money back," the judge told the financial officer. And [the defendant] says, "I don't want it." And [the judge] says, "What do you mean you don't want it? You need the money." And he says, "Your honor, I don't want it. I don't like what I had to do to get it. I don't want the money."

And the judge started crying and said, "I'm taking a recess." And nearly brought us all to tears in the room. All of us. And she called us back in chamber and said, "What can we do for this young man?"

. . . So, I asked the judge to advance the case back on the record, and I said, "Your Honor, would the court consider terminating probation today and I will prepare [a petition to dismiss the case] and have this expunged from his record?" And the judge said that she would. I felt that was the least I could do, as a society. But in the end, when he walked out, I knew [we] hadn't fixed anything for him, really. I hadn't given him a place to stay. I hadn't provided him an opportunity, other than that he didn't have to jump a turnstile or turn any more tricks to come back and pay restitution."[6]

---

[6] Mary Pattillo, et al., *Monetary Sanctions and Housing Instability*, 8 RSF: The Russell Sage Found. J. Soc. Scis. 2, 64-65 (2022).

¶46 Monetary sanctions, although perhaps imposed uniformly and thus appearing to be fair and equal, are mechanisms for entrenching and perpetuating the inequalities and disparities that already exist in society. Those economically disadvantaged, which have proven to be marginalized populations, disproportionately bear more "pain" from punishment for their crimes than do those less destitute. Monetary sanctions are therefore a central mechanism of inequality in the criminal justice system that serve to entrench and deepen the inequalities already present in a market based society.

¶47 This Court must acknowledge that the uniform imposition of mandatory financial obligations disproportionately impacts marginalized groups—*when the debt is first created*. The inequities are not alleviated by adjusting the collection or enforcement effort but nonetheless imposing the same fine—or creating the debt—without consideration of the circumstances surrounding a defendant's ability to pay. While it is the Legislature's prerogative to enact a mandatory fine and fee statute, it is our obligation to ensure those statutes are not imposed contrary to our excessive fines and fees clause and an individual's rights of due process and equal protection. Our tortured precedent recognizing an artificial distinction between imposing a debt and enforcing a debt was not necessary to acknowledge the Legislature's authority to set penalties. There has always been a constitutional and statutory basis to impose a fine and/or fee that fairly and equally extracts the proportionate amount of "pain" for a given crime. In a recent release from the Department of Justice,[7] it recognized that state and federal practices of "impos[ing] and

---

[7] U.S. Dep't of Justice, *Dear Colleague Letter to Courts Regarding Fines and Fees for Youth and Adults*, Office of Public Affairs (Apr. 20, 2023), https://perma.cc/6WRK-BYBY.

24

enforce[ing]" fines and fees "disproportionately affect low-income communities and people of color, can trap individuals and their families in patterns of poverty and punishment and may violate the civil rights of adults and youth alike." The Justice Department noted many jurisdictions have innovated to reduce the reliance on fines and fees. It also noted that "the unfettered *imposition* of fines and fees across the country has entrapped poor people, too many of whom are people of color, in a cycle of escalating debt, unnecessary incarceration and debilitating entanglement in our justice system." (Emphasis added.)

¶48    I realize that Curran has not made a constitutional challenge to *Mingus* and that in *Ingram*, as here, we also declined to address *Mingus*, concluding it had not been raised. However, I cannot subscribe to the artificial distinction created by this Court that imposition of a debt is different from enforcement of a debt. And—it is my opinion—that the inequalities in the labor and credit markets, which reflect historic and ongoing racial, ethnic, and other forms of discrimination, are thus replicated in the criminal legal system uniquely through monetary sanctions. Failure to address indigency upon imposition of the fine—under the guise that inequities will be addressed through the manner in which the fine is enforced—produces a disparate impact on the impoverished individual and entrenches patterns of poverty and punishment, in sharp contrast to the indigent defendant's counterpart who can afford the fine.

¶49    I dissent.


                                        /S/ LAURIE McKINNON

Justices Ingrid Gustafson and Dirk Sandefur join in the dissenting Opinion of Justice McKinnon.

/S/ INGRID GUSTAFSON
/S/ DIRK M. SANDEFUR